1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9   PAMELA KINCAID, DOUG DEATHERAGE, )        1:06-cv-1445 OWW SMS
    CHARLENE CLAY, CYNTHIA GREENE,   )
10  JOANNA GARCIA, AND RANDY          )        STATEMENT OF DECISION AND
    JOHNSON, INDIVIDUALLY ON BEHALF   )        FINDINGS RE: PLAINTIFFS'
11  OF THEMSELVES AND ALL OTHERS      )        APPLICATION FOR A
    SIMILARLY SITUATED,               )        PRELIMINARY INJUNCTION
12                                    )
                    Plaintiffs,       )
13                                    )
14        v.                          )
                                      )
15  CITY OF FRESNO, CALIFORNIA        )
    DEPARTMENT OF TRANSPORTATION,     )
16  ALAN AUTRY, JERRY DYER, GREG      )
    GARNER, REYNAUD WALLACE, JOHN     )
17  ROGERS, PHILLIP WEATHERS AND      )
    WILL KEMPTON, INDIVIDUALLY AND    )
18  IN THEIR OFFICIAL CAPACITIES;     )
    DOES 1-100, INCLUSIVE,            )
19                                    )
                    Defendants.       )
20  _____    )

21

22        Plaintiffs' application for a Preliminary Injunction came on

23  for hearing before the court on November 7, 16, 17, and 22, 2006

24  at 9:00 a.m. in Courtroom 3 of the above-captioned Court, the

25  Honorable Oliver W. Wanger presiding.  Plaintiffs were

26  represented by Paul Alexander, Esq. of Heller Ehrman LLP; Oren

27  Sellstrom, Esq. of The Lawyer's Committee for Civil Rights; and

28  by Michael T. Risher, Esq. of the ACLU Foundation of Northern

                              1

1    California.

2         Defendant City of Fresno was represented by James B. Betts,

3    Esq. of Betts & Wright.  The matter was submitted on Plaintiffs'

4    Motion, testimony of witnesses, exhibits received into evidence,

5    supporting and opposing Points and Authorities, accompanying

6    Declarations under Penalty of Perjury for both sides as well as

7    the oral arguments of counsel.  After fully considering all

8    submissions and evidence in support of and opposition to the

9    motion and the arguments of counsel, the Court enters the

10   following Findings of Fact and Conclusions of Law.

11

12                        I.   BACKGROUND

13        Plaintiffs seek an injunction to prevent the City of Fresno

14   from immediately seizing and destroying on the spot, their

15   personal possessions, during sweeps conducted by the City of

16   Fresno Police Department and City of Fresno Sanitation Department

17   to remove homeless persons, encampments, and their property from

18   private property and other locations within the City of Fresno.

19   The City of Fresno opposes the imposition of any injunctive

20   relief asserting: (1) the homeless do not need to be present on

21   private or other property within the City of Fresno because there

22   is adequate bed space for the homeless in the City of Fresno; (2)

23   temporary shelters and congregations of homeless individuals

24   create a risk to the public health and safety and generate

25   significant complaints from surrounding residents, business and

26   property owners; (3) the City provides sufficient "advance oral

27   and sometimes written notice," ranging from one to five days, to

28   the homeless in the area, that the residents of the temporary

                                2

shelters must move, and that any unclaimed property will be discarded; (4) that the City of Fresno is without funds or other resources to deal with the property of the homeless, except to immediately destroy it and cannot otherwise make such property available for reclamation; (5) that there are no trained City personnel available to deal with the property of the homeless which includes dangerous items such as syringes with needles and human waste; and (6) the City does not have the funds or other resources to transport and store property of the homeless.

A.   The Complaint

The following events form the basis for the complaint:

1.   May 3, 2006.  Defendants confiscated and destroyed the property of the homeless living on the west side of E Street, Broadway Street and H Street, Van Ness Street and Los Angeles Street, and Santa Fe Street and Ventura Street.

2.   May 25, 2006.  Defendants confiscated and destroyed the property of the homeless living on the west side of E Street.

3.   June 22, 2006.  Defendants confiscated and destroyed the possessions of the homeless, this time on both sides of E Street and Santa Clara Street.

4.   July 1, 2006.  Defendants confiscated and destroyed the property of the homeless living on the west side of E Street.

5.   August 26, 2006.  Defendants confiscated and destroyed the property of the homeless living on E Street, this time on both sides of the street.

6.   October 8, 2006.  Fresno police officers came to an area near H and San Benito streets where several homeless people

1   were found.   Some of these homeless people had shopping carts

2   that were their own property and essential for them to move their

3   property.   The police dumped the possessions onto the ground,

4   confiscated all of the shopping carts (even though there was no

5   lawful basis to do so) and took them away, apparently for

6   destruction.

7           7.     October 11, 2006.   Fresno police officers confronted a

8   group of homeless people in the area of H and San Benito Streets,

9   forced them to stand in lines for an extended time period and

10  specifically threatened them with a "formal warning" that the

11  police intended to return very soon (though they refused to say

12  exactly when) to destroy everything homeless people owned in this

13  area.

14

15  B.   Plaintiffs' Claims

16          Plaintiffs' claims include: violation of their rights under

17  the United States Constitution Fourth Amendment to be free from

18  unreasonable seizures and searches; the Fifth and Fourteenth

19  Amendments for deprivation and destruction of personal property

20  without due process of law without meaningful notice and the

21  opportunity to be heard at a meaningful time in a meaningful

22  manner; violation of the California Constitution Art. I, §§ 7 and

23  13, prohibiting unlawful searches and seizures of property and

24  deprivation and destruction without due process of law; violation

25  of California Civil Code § 2080 et seq., protecting the rights of

26  owners of "found" property; and violation of California Civil

27  Code § 52.1 et seq., for alleged interference with rights secured

28  by the Constitution or laws of the United States or rights

                                    4

1  secured by the Constitution and laws of the State of California

2  from infringement by threats, intimidation, or coercion.

3

4  C.   **DEFENDANTS' DEFENSES**

5      1.   Defendants cite public health and sanitation concerns.

6  Defendants claim that the areas where homeless individuals live

7  typically reek of urine and feces.  Such affected areas,

8  according to Defendants, include human sewage, syringes, used

9  condoms, rotting food, and piles of trash and debris.  Defendants

10  claim that the areas in and around the temporary shelters pose

11  public health and safety concerns including assault, drug use,

12  prostitution, and child endangerment.

13      2.   Defendants also argue that Plaintiffs' homelessness is

14  a choice rather than involuntary, due to the existence of

15  available shelter in the City of Fresno.  Defendants argue that

16  Plaintiffs are typically victims of substance abuse, drug use,

17  and alcoholism.

18      3.   Defendants claim that they do not have a pattern or

19  practice in place or that has been implemented to seek out or

20  eliminate shelters of homeless individuals and cannot be liable

21  under *Monell* for abridgement of civil rights under color of state

22  law.  Defendants argue that the shelters are instead removed as a

23  result of complaints by local residents and business owners. Each

24  of the enforcement actions complained of by Plaintiffs have

25  occurred on property owned by landowners who have requested the

26  City abate the public nuisance created by the temporary shelters.

27      4.   According to Defendants, notice was given prior to each

28  and every enforcement action.  The notice was an "organized

5

1  distribution of oral and written notice to the habitants of the

2  temporary shelters."  The notice stated, "If you have property in

3  these areas, please remove it or we will take it as trash.  Any

4  property found without the owner to claim it will be taken."

5  Defendants claim that the inhabitants were notified that a clean

6  up of the area would occur, and that all trash, including

7  unattended property found without the owner to claim it would be

8  removed.  In addition Defendants claim that they also gave

9  advanced notice at the local service centers like the Poverello

10  house and asked that those service providers also tell affected

11  individuals that they need to move.

12      5.    Defendants claim that only individuals who refuse to

13  comply with the City's clean up efforts experience any arguable

14  loss of property. According to Defendants, before any activity is

15  taken to effect a clean up of the area, the affected individuals

16  are provided with an opportunity to remove their personal

17  effects.  Defendants claim that the City has never denied an

18  individual the opportunity to remove personal property prior to

19  or during such clean up efforts.  The vast majority of

20  individuals affected by these clean up efforts voluntarily

21  comply, and relocate their personal effects prior to the clean

22  up.

23      6.    Defendants argue that the City has adopted a shopping

24  cart ordinance.  According to Defendants, the City does not

25  randomly throw away shopping carts which accumulate in or around

26  the downtown area.  Under the ordinance branded shopping carts

27  are collected and turned over to a private contractor who

28  specializes in the return of such carts to a private business.

## II.  <u>FINDINGS OF FACT</u>

A.  <u>The Homeless Population In The City of Fresno</u>

1.  According to the City of Fresno's consolidated plan for the fiscal years 2006 to 2010, a document adopted by the City as an admission, the City of Fresno had a homeless population of 8,824 people in 2005.  Over 7,000 of this population are unemployed.  (RT vol. II, 22, Nov. 17, 2006; Souza Ex. A, 28).

2.  The shelter available for homeless persons in the City of Fresno is substantially less than the need for that shelter. The existing overnight facility beds for individuals and families seeking shelter overflow daily, and there is a significant shortage of available overnight homeless shelter beds on a daily basis in Fresno.  (RT vol. III, 20, 22, Nov. 17, 2006: Souza Ex. A, 16).

3.  The City of Fresno contains several homeless service providers including The Poverello House, The Fresno Rescue Mission, Naomi's House, and the Village of Hope.

4.  The homeless shelters do not always operate at full capacity.

5.  Some of the shelters have conditions or requirements that some homeless people may not be able to meet, such as daily prayer in the Christian Faith.

6.  Even if the homeless shelters operated at full capacity, there is still insufficient accommodations for the homeless population in the City of Fresno.

7.  Andrew Souza("Souza"), the City Manager for the City of Fresno who reports directly to the Mayor, admits that the City of Fresno does not have enough accommodations to meet the needs of

1 | the homeless of the City of Fresno.

2 |     8.  At most there are 40 beds available, nightly, for the
3 | over 2,000 homeless women living in Fresno.

4 |     9.  At most there are approximately 175 beds for the
5 | approximately 2,400 homeless men living in Fresno.

6 |     10.  Over the last three years homeless temporary shelters
7 | have been erected by the homeless residents in the downtown area.

8 |     11.  There are temporary shelters located on Ventura Street
9 | and E Streets in the City of Fresno.

10 |     12.  There are also temporary shelters on G Street just
11 | south of the Rescue Mission underneath the overpass.

12 |     13.  There is an H street encampment, which is rather large,
13 | behind the Rescue Mission.

14 |     14.  South of Poverello House, people live in abandoned
15 | buildings.

16 |     15.  People also live in the island between Highway 99 going
17 | north and south.

18 |     16.  People live behind gas stations near Fresno Street.

19 |     17.  People in the downtown area live in the alcoves of
20 | buildings and the bushes near these buildings.

21 |     18.  These temporary shelters have included anywhere from
22 | fifty to sixty residents to as few as ten or twenty residents.

23 |     19.  These temporary shelters are formed even when homeless
24 | facilities are not full to capacity.

25 |     20.  The supply of overnight shelter space consists of the
26 | following: Naomi's House, the primary women's shelter for
27 | homeless single women in Fresno, has 22 beds and two emergency
28 | cots.  (RT vol. I, 64, Nov. 7, 2006) (Apper).  Naomi's house is

frequently at full capacity and unable to accommodate homeless single women.  In an attempt to deal with the fact that the demand for beds far outstrips the supply, Naomi's House has resorted to various means, such as holding a daily lottery to determine which women will get beds or asking women already residing in the shelter to give up their spot to another woman who requests shelter on any given night.  (*id.*).  (Testimony of Doreen Eley, Nov. 17, 2006).  Naomi's House requires that all women staying there leave every morning at 7:30 a.m. and do not check in before 4:30 p.m. (RT, vol. I, 71, Nov. 7, 2006).  (Connell).

21.    The Poverello House's Village of Hope has a total of 44 beds in 22 ten foot by ten foot Tuff Sheds (tool sheds) that do not have plumbing or electricity, available for homeless men or women.  (RT vol. I, 64, Nov. 7, 2006) (Apper).  Residents of the Village of Hope must be voted in by current residents as a condition to stay overnight there and must perform assigned chores on a daily or weekly basis.  (RT vol. I, 80, 110, Nov. 7, 2006) (Connell).  Some homeless are unable to stay at the Village of Hope because they are not voted in, or because they find the conditions unsafe or otherwise problematic.  For example, homeless people with jobs may find that assigned chores conflict with their work schedule.  Many homeless people own a dog for protection or companionship and the Poverello House does not permit the owner to keep his or her dog in the shed.  (RT vol. II, 50-52, Nov. 16, 2006) (Deatherage).  Residents must leave the Village of Hope at 7:30 a.m. every morning and cannot return to their shelter before the evening.  (RT vol. I, 110-11, Nov. 7,

1  2006) (Connell).

2      22.   The Fresno Rescue Mission, the primary men's shelter

3  in Fresno, has approximately 134 beds and requires participation

4  in Christian faith prayer services as a condition of staying

5  there.  (RT vol. I, 65-66, Nov. 7, 2006) (Apper).  Women are not

6  allowed in the Fresno Rescue Mission.  The men who stay there can

7  keep no property with them and they cannot stay there between

8  7:00 a.m. and 5:00 p.m.  (Testimony of Larry Arce, Nov. 17,

9  2006).

10     23.   Assuming the Tuff Sheds at the Poverello House were

11 split evenly between men and women, there are approximately 46

12 beds for women and 157 beds, totaling 203 beds for homeless men

13 and women in the City of Fresno.  There are thousands of homeless

14 people in Fresno who have no shelter and therefore must sleep in

15 tents or other makeshift shelters.

16     24.   It is common for homeless people to store their

17 belongings in a shopping cart, some other cart or other wheeled

18 device.  (RT vol I, 159, Nov. 7, 2006) (Apper).  Due to the

19 uncertainty of living on the street, homeless people often desire

20 to have their possessions ready to move.  (RT vol. I, 158-59,

21 Nov. 7, 2006; vol. II, 117, Nov. 16, 2006) (Apper and Kincaid).

22 It is common for homeless people to store their belongings in

23 such a way that fits in the cart, buggy or other similar device.

24 It is also common for homeless people to cover their carts

25 containing their property with a blanket or tarp, to protect the

26 property.  (RT vol. II, 10, 96, 123, Nov. 16, 2006) (Thomas,

27 Williams and Kincaid).  Social service workers, police officers,

28 and other City employees and officials who have regular contact

1 with homeless people actually know, or reasonably should know,

2 that homeless people commonly store their property in this

3 manner.   (Testimony of Greg Garner, Nov. 17, 2006).

4       25.   As a practical matter, homeless people cannot stay

5 with their property 24 hours per day because they, like people

6 who have homes, have to use the bathroom, shower, and conduct

7 other necessary daily activities.   (RT vol. II, 19, Nov. 16,

8 2006) (Thomas).   Those who have jobs must leave their belongings

9 while they work, recycle, or engage in other activities.   (*See,*

10 *e.g.,* RT vol. II, 33, Nov. 16, 2006) (Deatherage).   They

11 nonetheless have an expectation of continued ownership of their

12 property and do not intend to abandon their property because they

13 leave it in a cart or similar device, which is covered by or

14 wrapped in a blanket, tarp, or tent, unattended for a period of

15 time.

16       26.   Between 4,400 to 8,800 of Fresno's approximately

17 440,000 residents are homeless, according to a recent report by a

18 consortium of local government agencies and providers.   (Doc. 1,

19 Complaint, ¶33)  "[O]nly 1.4% of the homeless population [is]

20 sheltered....leaving more than 98% of the homeless population

21 unsheltered and receiving no services."   Individuals without

22 residences have set up temporary shelters in the southwestern

23 area of the City of Fresno on property they do not own and do not

24 maintain.   The City asserts such temporary shelters and

25 congregations of individuals create a risk to the public health

26 and safety and generate significant complaints from surrounding

27 residents, business and property owners.

28 ///

**B.    City's Response to Complaints About the Homeless**

27.    In response to complaints about the temporary shelters, for the last three years the City of Fresno has conducted "clean ups" or sweeps of these shelters.

28.    The City of Fresno's response to the numerous complaints about homeless encampments has been to provide "advance oral and sometimes written notice," ranging from one to five days, to the homeless in the area, that the residents of the temporary shelters must move, and that any unclaimed property will be discarded.  The exact timing, form and adequacy of the notice given is a materially contested fact, particularly as to personal property of the homeless persons that will be discarded or destroyed.

29.    When the City removes a temporary settlement, a bulldozer, City garbage truck, or other heavy equipment are employed by Sanitation Department personnel, to pick up most of the Plaintiffs' possessions and dump them in a garbage truck where the property is immediately crushed by compaction.

30.    The evidence focused on six of these sweeps in which residents of temporary shelters were required to move with their property.  All the property that was not carried away by the individual owners was loaded into garbage trucks and destroyed on the spot.

31.    Further dispute exists to when and to what extent Plaintiffs are permitted to retrieve their possessions or save them from destruction before and during the sweeps.  Plaintiffs testified that efforts to save their possessions have resulted in arrest threats.  The Fresno Police who execute the sweeps have

12

1  announced to individuals present that once the heavy equipment

2  and garbage trucks arrive, no one, including the owners, may

3  interfere with the seizure and destruction of the property due to

4  safety concerns.

5

6  C.   The City of Fresno's Seizure and Destruction of the Property

7       of the Homeless

8       32.   It is the City's policy, pattern and practice to seize

9  and immediately destroy property of the homeless, including tents

10 and carts containing personal possessions, that are not

11 immediately attended to by the owner or that remain in an area

12 after a time set by City officials.   (RT vol. III, 11-12, Nov.

13 17, 2006) (Souza), (RT vol. II, 33-52, 67-77, 94-110, 115-29,

14 Nov. 16, 2006; *see also* Testimony of Joanna Garcia, Nov. 17,

15 2006) (Deatherage, Nelson, Williams and Kincaid).   More

16 specifically, the City's policy is that any property that is not

17 physically attended to by its owner is considered abandoned and

18 is defined by the City as "trash."   All such property will be

19 destroyed with no chance for the owner to reclaim it.   (RT vol.

20 III, 24, Nov. 17, 2006) (Souza).

21      33.   Fresno Police Department Specialist Reynaud Wallace

22 originally developed this practice as a method of dealing with

23 homeless persons in Fresno.   (Testimony of Reynaud Wallace, Nov.

24 22, 2006).   This practice of treating property of the homeless as

25 abandoned and therefore trash, has been adopted by the City

26 Manager, City Police Department, and has been implemented in at

27 least fifty sweeps in the last two years.

28      34.   Under the City's policy, even property stored on real

13

property with permission from the real property owner has been
considered abandoned and immediately destroyed by the City.
(Testimony of Greg Garner, Nov. 17, 2006).  Although this policy
is not in writing, it has been adopted by the city of Fresno as
part of its official policy toward the property of the homeless.
Under this policy, the City seizes and immediately destroys
property of the homeless, with no opportunity for a hearing or to
claim or recover their property.  (RT vol. III, 24, Nov. 17,
2006) (Souza).  The testimony of witnesses Mr. Weathers, a
supervisor in the Fresno City Sanitation Department, Specialist
Wallace, and Captain Garner are all consistent with this finding.

35.  Pursuant to the City's policy and practice, the City,
through its Police Department and Community Sanitation Division,
has conducted sweeps of various locations where homeless people
live in the City of Fresno approximately 25 times per year since
the beginning of 2004, in which the property of the homeless has
been confiscated and immediately destroyed.  (Testimony of
Reynaud Wallace, Nov. 22, 2006; *see also* RT vol. II, 83-83, 117-
18, Nov. 16, 2006) (Williams and Kincaid).

36.  The temporary shelters consist of temporary camping
tents or are fabricated of whatever materials are available.
Such materials include pieces of metal, tents, wooden structures,
branches from trees, discarded mattresses, and various different
items.

37. Pursuant to its policy, pattern and practice, the City
confiscated and immediately destroyed the property of homeless
persons living on the west side of "E" Street, Broadway Street,
and "H" Street, Van Ness Street and Los Angeles Street, Sante Fe

Street and Ventura Street in Fresno, on May 3, 2006.  (Statement
of Decision and Findings re: Plaintiffs' Application For
Temporary Restraining Order, 3, October 23, 2006; Rhodes Decl. ¶
5; Garcia Decl. ¶ 5).

38.   Pursuant to its policy, pattern and practice, the City
confiscated and immediately destroyed the possessions of the
homeless on both sides of "E" Street and Santa Clara Street in
Fresno on June 22, 2006 (RT vol. I, 149, Nov. 7, 2006) (Apper).

39.   Early in the morning of June 22, 2006, City workers
began removing tents and other property with bulldozers on the
west side of "E" Street.  Some homeless people tried to save
their tents and property by moving it to the east side of "E"
Street, under the understanding from previous City sweeps that
their property would be safe there because the City would not
sweep that side.  However, on this occasion the City extended its
sweep to the east side of "E" Street as well as the west side.
(RT vol. I, 149-74, Nov. 7, 2006; Apper Ex. J) (Apper).  City
workers removed and destroyed a tent where a person's
identification was hanging from a door.

40.   In October 2006, the court issued a temporary
restraining order against the immediate destruction of the
property of the homeless by the City of Fresno.

1.   Lisa Apper

41.   Ms. Apper was present at this sweep and attempted to
save four shopping carts containing a homeless persons'
possessions.  Specialist Wallace challenged Ms. Apper to identify
the owner of the carts and told her that the carts of which she

15

attempted to take possession were trash and had to be destroyed.
(RT vol. I, 155-57, Nov. 7, 2006; Apper Ex. B, C, D) (Apper).
Despite Specialist Wallace's testimony that he knew all the carts
belonged to someone, the City seized and immediately destroyed
all of the property in three of the carts and the carts
themselves, except for one cart that Ms. Apper was physically
holding and apparently refused to release.

    42.   Captain Garner told Ms. Apper that she could go to jail
for obstruction for her efforts to save the property.  This
seizure of property directly contradicted Garner's and Wallace's
testimony that persons present at sweeps who claim property are
always permitted to take it.  The City seized and immediately
destroyed the three carts in addition to other shopping carts in
the area, by placing them into a dump truck where the carts and
the property contained within were smashed and compacted.  (RT
vol. I, 162-70, Nov. 7, 2006; Apper Ex. E, G, H; Rhodes Ex. E)
(Apper).

    2.   <u>Sandra Thomas</u>

    43.   The evidence established that the property and carts
that Ms. Apper was attempting to save in fact belonged to a
homeless person, Ms. Sandra Thomas.  Ms. Thomas testified she
made substantial efforts to secure her property and keep it from
destruction from the June 22, 2006, sweep and had no intention to
abandon her property.  Ms. Thomas learned that the City intended
to conduct a sweep on the morning of June 22, 2006, but, based on
past sweeps, understood that this would occur on the west side of
"E" Street, not the east side.  She therefore awoke early on the

morning of June 22, 2006, packed all of her possessions, and
moved them to the east side of the street.  She took the further
step of seeking permission from the owner of a house on the east
side of the street to allow her to store her property in front of
that house.  Her property was stored, essentially on the private
property of a resident of "E" Street, with that resident's
permission.  Ms. Thomas also obtained permission from Specialist
Wallace to leave her belongings unattended while she ran personal
errands, which included visiting a nearby recycling center and
going for a shower and breakfast.  When Ms. Thomas returned, all
that remained of her property after the City destroyed the rest
was the one cart which Ms. Apper saved.  Among several of Ms.
Thomas' possessions, the City destroyed her backpack which
contained her driver's license, Social Security identification,
and her grandmother's wedding band.  Because Ms. Thomas' shelter
was destroyed, she had no shelter or other possessions and was
therefore forced to sleep on the street with no shelter that
evening, which contributed to her catching pneumonia in both
lungs.  (RT vol. II, 7-28, Nov. 16, 2006; Apper Ex. C, G through
I) (Thomas).  Ms. Thomas' testimony was not contradicted.

        3.   The Bicycle

        44.  Also on June 22, 2006, and pursuant to its policy,
pattern and practice, the City took and immediately destroyed a
significant amount of other property of the homeless, including
tents, blankets, and a functional bicycle in good repair that had
been left by its owner in the area where homeless people live.
The City seized the bicycle from the location where it was stored

17

and threw it into a garbage truck, where the bicycle and other property were all crushed.  (Rhodes Ex. E, F).  Under the City's policy, pattern and practice, a fully functional bicycle found without its owner in the area where homeless people live during one of the City's homeless "sweeps" is considered abandoned, therefore "trash," and is immediately destroyed.  (Testimony of Phillip Weathers, Nov. 17, 2006; *see also* RT vol. III, 24, Nov. 17, 2006) (Souza).  Both Mr. Weathers and Mr. Souza testified the bicycle which appeared in photographs to be in good condition was "trash" because it was unattended.  Each City witness explained that property found at any sweep location that is unattended is treated as "abandoned" and subject to immediate destruction because the City of Fresno deems the property to be "trash," no matter its nature, condition, or value.

### 4.   Douglas Deatherage

45.   Also on June 22, 2006, and pursuant to its policy, pattern and practice, the City took and immediately destroyed the property of Douglas Deatherage, a homeless man.  Mr. Deatherage lived in a tent with his current fiancé, Pamela Streeter, on the west side of "E" Street on June 22, 2006.  He had previously lived at the Village of Hope, but because he had a dog, worked during the day and was assigned security at the Village of Hope at night, he was not able to get adequate rest and had to leave. Mr. Deatherage has a job sorting out building materials but cannot afford a home.  (RT vol. II, 33-34, Nov. 16, 2006) (Deatherage).  On the morning of June 22, 2006, Mr. Deatherage first learned of the City's intended action in the area when he

1  saw the bulldozer and city trucks at the site.  Mr. Deatherage
2  moved his property, tent and shopping carts to the east side of
3  "E" Street because the City had previously permitted the homeless
4  to move their property to the east side of the street during the
5  sweep and then return to the west side after the sweep.  When Mr.
6  Deatherage returned from the store, he learned from Ms. Streeter,
7  who remained with the property, that the City workers took and
8  destroyed their property despite her efforts to stop them and
9  claim the property.  The City destroyed Mr. Deatherage's tent,
10 sleeping bags, clothes, hygiene kits, shoes, an antique stamp
11 collection, letters from his father, birthday cards to which he
12 looked for an inspiration, and Ms. Streeter's urn containing the
13 ashes of her granddaughter.  The destruction of this property
14 makes it harder for Mr. Deatherage to hold his job without clean
15 clothes and harder for him to survive because he must spend his
16 income to replace some of what was destroyed.  (RT vol. II, 33-
17 52, Nov. 16, 2006) (Deatherage).

18      46.  Pursuant to its policy, pattern and practice, the City
19 confiscated and immediately destroyed additional valuable
20 property of homeless persons living on the west side of "E"
21 Street in Fresno, on July 1, 2006.  (Statement of Decision and
22 Findings, 4; Rhodes Decl. ¶ 15).

23      47.  Pursuant to its policy, pattern and practice, the city
24 confiscated and immediately destroyed the property of homeless
25 persons living on both sides of "E" Street in Fresno, on August
26 26, 2006.  (RT vol. I, 184, Nov. 7, 2006) (Apper).  The City gave
27 written notice that it would be sweeping the area on August 25,
28 2006, but actually conducted the sweep the following day.  (RT

vol. II, 45, Nov. 16, 2006) (Deatherage).  The City offered in
evidence only one written notice of a sweep, which specified the
wrong date for the sweep.

48.  On July 1, 2006, the City again employed a bulldozer
and garbage truck to take and immediately destroy property,
affording no opportunity to homeless to recover their property.
For example, after unsuccessful requests to City workers for more
time, Mr. Deatherage was unable to move his property to safety on
August 26, 2006, and the City again destroyed his clothes,
sleeping bag, stroller, backpack and tarps in a garbage truck.
(RT vol. II, 44-47, Nov. 16, 2006) (Deatherage).

49.  Once the City had finished its business in the area
between Highway 99 and "E" Street, the City erected a fence so
that the area was inaccessible to people.  (RT vol. I, 184-89,
Nov. 7, 2006) (Apper).  The purpose of erecting the fence was to
prevent the homeless people from returning to that area.
(Testimony of Greg Garner, Nov. 17, 2006).  The City did not make
any other place available for the deposit of homeless people's
property.  (RT vol. I, 184-90, Nov. 7, 2006) (Apper).


5.  H Street Property

50.  Pursuant to the City's policy, pattern and practice,
Fresno Police destroyed the property of homeless persons at an
area near "H" and San Benito Streets on October 8, 2006.  Some of
these homeless people had shopping carts that they claimed were
their own property which they used to move personal property.
Police dumped the possessions on the ground, confiscated all the
shopping carts and removed them.  (Statement of Decision and

1  Findings, 4; Clay Decl. ¶ 5; O'Brien Decl. ¶ 6).  The Fresno

2  Police acted under a shopping cart ordinance, which was not yet

3  in effect and did not become effective until October 27, 2006, as

4  a tool to take these carts from homeless people.  (Testimony of

5  Greg Garner, Nov. 17, 2006; Garner Ex. G).

6       51.  On October 11, 2006, Fresno Police Officers confronted

7  a group of homeless people in the area of "H" and San Benito

8  Streets, ordered them to stand in lines for a period of time, and

9  gave the people a "formal warning" that the Police intended to

10 return "very soon," and would continue to confiscate and destroy

11 any property of the homeless found in that area, though the

12 police did not say when, to destroy everything homeless people

13 owned in the area.  (Statement of Decision and Findings, 4;

14 Vizcarrando Decl. ¶¶ 2-7; Tracy Williams Decl. ¶¶ 2-4).

15      52.  Additionally, pursuant to the City's policy, pattern

16 and practice, Fresno City sanitation workers and Police Officers

17 have routinely taken and immediately destroyed homeless people's

18 property in other parts of Fresno, often in locations where

19 individual or small groups of homeless people live.  (RT vol. I,

20 196-97, Nov. 7, 2006) (Apper).

21

22      6.  <u>Jeannine Nelson</u>

23      53.  Pursuant to the City's policy, pattern and practice,

24 the City took and immediately destroyed the property of Jeannine

25 Nelson, who was homeless on occasion since 1996, but obtained

26 permanent housing in September, 2006.  In March, 2006, Ms. Nelson

27 was living in an empty field off of Cedar and Gettysburg Streets

28 in north Fresno, when Fresno Police Officers seized and destroyed

1  her property and the property of her friends, Mr. Rodriguez and

2  Mr. Pine.  The Police Officers gave Ms. Nelson ten minutes to

3  move her property out of the field and instructed her to throw

4  away the rest.  The Officer told Ms. Nelson "he never wanted to

5  see her again."  As a result, she lost pillows, blankets,

6  clothing, jackets, shoes, paperwork, and food.  Ms. Nelson, Mr.

7  Pine and Mr. Rodriguez subsequently moved to a church on

8  Millbrook and Shields Streets in Fresno with the express

9  permission of the church's pastor and congregation, which was

10 published in the church newsletter.  (RT vol. II, 60-64, Nov. 16,

11 2006; Nelson Ex. A) (Nelson).

12      54.   Around the end of June 2006, a Fresno police officer

13 destroyed Ms. Nelson's and Mr. Rodriguez's property, which Ms.

14 Nelson was watching, by pushing their shopping carts packed with

15 their belongings into an irrigation canal of rushing water.

16 There was no prior notice of this seizure and destruction.

17 Despite Ms. Nelson's presence with the property and her offer of

18 written proof she had permission to be on church property, the

19 police destroyed their property.  Mr. Rodriguez lost his cart

20 containing his stereo, clothing, bedding, toiletries and his

21 prized photo album containing pictures of him as a young man in

22 the Marine Corps, his children and grandsons.  Ms. Nelson lost

23 her cart containing her birth certificate, medical files for that

24 year with which she filed for Social Security disability, her

25 California identification card, clothing, toiletries, bedding,

26 food, asthma medication and a nebulizer machine which she used to

27 breathe.

28      55.   Subsequently, Ms. Nelson had to spend much time in the

1   hospital emergency room until she eventually replaced her asthma

2   medications two months later and obtained a new breathing machine

3   five months after the destruction.  Ms. Nelson had to refile for

4   Social Security disability and must now try to replace her

5   identification, birth certificate, and medical records to qualify

6   for disability.  With money earned from recycling and given to

7   her by her pastor, Ms. Nelson was able to obtain an apartment

8   with the help of a Section 8 subsidy in September 2006.  (RT vol.

9   II, 67-77, Nov. 16, 2006) (Nelson).

10

11          7.   **Alfonso Williams**

12          56.   Pursuant to its policy, pattern and practice, the City

13   took and immediately destroyed the property of Alphonso Williams,

14   a homeless man, who has seen City workers and police officers

15   destroy the property of homeless people from seven to eight times

16   over the last several years.  In the fall of 2005, Mr. Williams

17   was living on the 1700 block of Olive Avenue when the City took

18   and destroyed his property.  Without prior notice, Fresno City

19   police officers ordered Mr. Williams to move all of his property

20   in one hour.  Mr. Williams was able to load most of his property

21   into his friend's truck when City workers arrived in City of

22   Fresno trucks with a bulldozer and a City pickup truck.  The City

23   destroyed the property that Mr. Williams was not able to load

24   onto his friend's truck because the City workers insisted that

25   Mr. Williams ran out of time.  A police officer then told Mr.

26   Williams that his friend's truck would be towed and that Mr.

27   Williams had to unload his property from his friend's truck in

28   order to save it.  After the police watched Mr. Williams unload

23

his property, he left for 30 to 45 minutes to search for more transportation for his property and returned with two shopping carts to find the City had confiscated and destroyed the rest of his property, including his wife's wheelchair and necessary medications, their wedding pictures and family portraits.  That night, Mr. Williams and his wife had to sleep without shelter or blankets.  Following this destruction, Mr. Williams' wife, who was in ill-health and prone to seizures, was in a coma for two weeks.  (RT vol. II, 81-92, Nov. 16, 2006) (Williams).

57.  In August 2006, at 7:00 a.m., Mr. Williams returned to his temporary shelter on West Olive and West Avenues to find several police cars, a garbage truck, a City of Fresno van and City workers present at his temporary shelter.  By this time, the City workers had confiscated and destroyed one-half of Mr. Williams' property.  Mr. Williams saw City workers throwing shopping carts in the garbage truck, where the carts were crushed.  The police refused to allow Mr. Williams to reclaim his property and threatened him with tasers if he attempted to interfere with the work of the City crews in an effort to retrieve his property.  (RT vol. II, 94-110, Nov. 16, 2006) (Williams).

        8.   **Pamela Kincaid**

        58.  Pamela Kincaid, a homeless woman, has observed at least 30 occasions over the last six years where the City of Fresno has taken and immediately destroyed the property of homeless people at several locations throughout the City, pursuant to its policy, pattern and practice of confiscating and immediately destroying

property of the homeless.  In the early summer of 2006, Ms. Kincaid witnessed the City's destruction of an eight-man tent containing kittens, using a bulldozer.  At no time has Ms. Kincaid witnessed property saved to be reclaimed by its owner. Ms. Kincaid could not stay at Naomi's House because she is claustrophobic and had five panic attacks in the seven days she was there.  (RT vol. II, 114-30, Nov. 17, 2006) (Kincaid).

59.  Pursuant to its policy, pattern and practice of defining unattended property of the homeless as abandoned and trash, the City destroyed Ms. Kincaid's property at least six times over the past six years, during which Ms. Kincaid received advance notice on one occasion and was never given the opportunity to reclaim her property.  In 2005, Ms. Kincaid had no notice of the City's arrival, and despite her presence with her property and her attempt to save it, the City told Ms. Kincaid that she had no more time to move her things.  Most of her property was immediately destroyed.

60.  On another occasion in 2005 where Ms. Kincaid left her property unattended, she returned to find all of her property gone.  Ms. Kincaid lost everything she owned, including family photos, important documents, birth certificates, and her telephone and address book.

61.  Around October 2006, Ms. Kincaid left her temporary shelter and her packed and covered cart to recycle to earn money. Ms. Kincaid's cart was an old cart from a Thrifty store, which she obtained after Thrifty ceased business.  She returned to find that most of her property that was in the cart had been dumped on the ground and her cart and her tools were gone.  Ms. Kincaid

later learned that the City of Fresno took her shopping cart and the carts of others.  Ms. Kincaid can no longer earn income by making and selling crafts because the City took all of her tools she used to make crafts.  The City has not told Ms. Kincaid of a place where she and her property will be safe, but has told her to "stay out of sight."  (RT vol. II, 115-29, Nov. 16, 2006) (Kincaid).

### 9.  Joanna Garcia

62.  The City has, pursuant to its policy, pattern and practice, destroyed the property of Joanna Garcia, a homeless woman, on five separate occasions when she lived in the vicinity of Ventura, "C" and "E" Streets.  In March 2005, without prior notice, the City destroyed the "ponytail" of hair of Ms. Garcia's son, a memento of her son, whom she had not seen in several years due to her homeless status.  The City also destroyed her grandmother's photo and important papers.

63.  In May 2006, without prior notice, the City destroyed all the property that Ms. Garcia could not carry, including her medications, blankets, clothing, her dog and ten puppies.

64.  In August 2006, after City workers gave Ms. Garcia seven minutes to pack up, the City destroyed all of her property in her presence, including tents, blankets, sleeping bags, identification and her blood pressure medication.  (Testimony of Joanna Garcia, Nov. 17, 2006).

65.  The Court finds that the experiences and harms of Ms. Garcia and all the other homeless witnesses who testified in this proceeding are typical of the experiences and harms suffered by

other homeless people as a result of the city-wide practice and policy of declaring unattended property of the homeless, abandoned and trash, and immediately destroying such property, which is carried out by the City of Fresno through its City Manager, Department of Sanitation, and Police Department.

66. Specialist Wallace did not keep count of all of the carts containing the property of the homeless that he has observed being destroyed by the City pursuant to its policy, practice and pattern, but he estimates that the number of such destroyed carts containing the homeless' property was at least in the hundreds and "countless" over the past two years in the southwest district of the City alone.  (Testimony of Reynaud Wallace, Nov. 22, 2006).

67. The testimony of these seven witnesses directly contradicted the testimony of City witnesses who testified the homeless were always permitted to remove their property during clean-ups.  The Court finds this collective, specific testimony more credible, based on the lack of any specific contradictory evidence from the City.

D.   Notice

68. The City contends that each of its sweeps of locations where the homeless live and its concurrent destruction of property is in response to related complaints made to the City by private property owners, including CalTrans and railroads, but did not provide the Court with any written evidence of such complaints.  (RT vol. II, 7, Nov. 17, 2006) (Souza).

69. The City contends that it issued written or oral notice

1   for every sweep it conducted but offered in evidence only one

2   "form" of a written notice, which itself announced a sweep for an

3   incorrect date.  This form specifically stated that any property

4   found without the owner to claim it will be taken as trash, and

5   provided no way for seized property to be reclaimed.  (Gardner

6   Ex. D).

7       70.  City Manager Souza testified that the City tries to

8   give advance notice from one to five days before a sweep.

9   However, Mr. Souza has seen none of the notices he claims the

10  City has generated for its sweeps.  (RT vol. III, 8-26, Nov. 17,

11  2006) (Souza).

12      71.  Specialist Wallace testified that he attempts to give

13  oral notice of a sweep to the homeless, but testimony of at least

14  seven victims of the City's property destruction showed that a

15  significant number of homeless people did not receive such

16  notice.  (Testimony of Reynaud Wallace, Nov. 22, 2006).  During

17  one of the City's sweeps in the summer of 2006, the Poverello

18  House staff generated a written notice, which was posted at the

19  Poverello House.  The Poverello House claims it generated

20  additional written notices of City's sweeps for various dates.

21  None of these notices were offered in evidence.  (RT vol. I, 98-

22  106, Nov. 7, 2006; Apper Ex. N) (Connell).

23      72.  The testimony of the homeless persons whose property

24  the City destroyed shows that any notice the City may have given

25  was substantially ineffective and experience has proven, by a

26  preponderance of the evidence, not reasonably calculated to

27  provide effective notice.  The City's practice is to immediately

28  seize and irrevocably destroy homeless people's property without

1  adequate pre-deprivation notice.

2      73.   There is no ability for people to reclaim their
3  property because the property is immediately destroyed, and no
4  means of post-deprivation relief is provided.   (Testimony of Greg
5  Garner, Nov. 17, 2006).

6      74.   The City presented no evidence of any pre- or post-
7  deprivation remedy available to persons whose property is seized
8  and destroyed.

9      75.   Captain Garner and Specialist Wallace testified that
10  the Fresno Police gave both oral and written notice to the
11  residents of the temporary shelters before each clean-up was
12  conducted.

13      76.   Captain Garner testified that the police noticed
14  everyone in the area including service agencies, private
15  businesses, private homes, everybody in the area.

16      77.   Captain Garner testified the police wanted to make sure
17  no one was caught off guard by what the police were trying to
18  accomplish.

19      78.   The single notice of clean-up submitted by the City
20  into evidence is incorrectly dated August 25, 2006.   No clean-up
21  actually occurred on August 25, 2006.   The clean-up was on
22  October 26, 2006.

23      79.   Captain Garner does not know if any other copies of
24  this notice exist, other than from the notice that was attached
25  to his declaration.

26      80.   Captain Garner directed that the incorrect notice was
27  to be distributed "as it normally is."   Captain Garner assumed
28  that his direction was carried out.

1    81.   Captain Garner did not actually see the notice of any
2  clean-up effort distributed to anyone.

3    82.   Captain Garner claims that besides providing written
4  notice, he also visited the areas of the temporary shelters.

5    83.   Mayor Autrey was present at the site of the temporary
6  shelters on August 25, 2006.   The Mayor requested that the clean-
7  up be postponed for 24 hours so that adequate notice could be
8  given.

9    84.   Captain Garner spoke with the Poverello House and asked
10  them to reinforce the notice given to the residents of the
11  temporary shelters.

12    85.   Mr. Connell testified that he could not say for certain
13  if written notices were posted in the areas of the temporary
14  shelters before the relocation occurred.

15    86.   In response to the City's request to give homeless
16  individuals notice of the relocation, the Poverello house created
17  fliers and posted them in the dining room and around the
18  property.

19    87.   Mr. Connell testified that in his opinion, this was a
20  reasonable method of providing notice to the residents of the
21  temporary housing because many of the homeless eat their three
22  meals a day at the Poverello House.

23    88.   In the times that Mr. Connell has been through the area
24  he does not have specific recollection of seeing a specific
25  notice by the City of Fresno announcing the clean-ups.

26    89.   There was no evidence offered of any notice provided by
27  the City Manager's office.

28    90.   The City of Fresno did not present any physical

evidence of written notices of past clean-up efforts other than the incorrect notice for August 22, 2006.

91. Mr. Souza's knowledge of whether notice is provided before each clean-up is based solely on discussions that he has had with his staff. He had no direct knowledge.

92. Mr. Souza has never actually seen a written notice that has been distributed prior to the clean-up efforts.

93. Mr. Souza does not actually know what the notices say.

94. Specialist Wallace also provides notice orally to the residents of the temporary shelter and leaves the written notice on every tent or inside every tent.

95. However, any written notice that Specialist Wallace distributed to residents of any temporary shelter was not offered into evidence.

96. Specialist Wallace also testified that he notified the Poverello House about the clean-up efforts because he knows that the majority of the residents eat at the Poverello House.

E.   Experience of Service Providers

     1.   The Poverello House

97. The Poverello house has 22 sheds and room for 44 people. Each shed has 2 beds for a total of 44 beds.

98. James Connell is the Executive Director of the Poverello House.

99. Mr. Connell has observed various health and safety problems coming from the temporary shelters. He observed people performing bodily functions in the street and in the gutters, the presence of open trash, rotting food, and potent smells.

31

1    100.   Mr. Connell and other members of his staff interact
2    with individuals living in the temporary shelter in front of the
3    Poverello House on a daily basis.

4    101.   The Poverello House is a homeless shelter that
5    provides basic human services for the homeless.   It provides
6    approximately 1,200 meals a day, three meals a day, seven days a
7    week.

8    102.   The Poverello house has a medical and dental clinic in
9    collaboration with St. Agnes Medical Center.   It also has
10   clothing distribution, a shower facility, a laundry facility, and
11   a substance rehabilitation program.

12   103.   The Poverello house has 28 beds for men who stay for a
13   minimum of six months.

14   104.   The Poverello House has a storeroom where it allows
15   homeless individuals to store their things while they seek
16   shelter for the night.

17   105.   Mr. Connell has not heard of any problems with the
18   storage and tagging procedure at the Poverello House.

19   106.   The Poverello House workers do not wear biohazard
20   suits when sifting through unclaimed belongings after the 30 day
21   time limit has expired.

22   107.   Poverello residents may access their things on a daily
23   basis.   The policy for storage is that individuals can store
24   their items for 30 days.   Their belongings are tagged and they
25   get a copy of that tag.   After 30 days they may renew their tag
26   to continue to store their things.

27   108.   When the belongings have been left there for more than
28   30 days and no one has checked in, the warehouseman goes through

1   the belongings and attempts to recover anything that appears to

2   be of value or a personal memento.  Anything of value is taken

3   out and repackaged.  The rest of such property is discarded.

4       109.  Sometimes some of the nurses from the Poverello House

5   clinic would provide care to individuals living in the temporary

6   shelters as a result of an assault or someone needing treatment.

7       110.  The Poverello House filed complaints with the City

8   because it was receiving complaints from clients seeking their

9   services regarding the temporary shelters and individuals in the

10  temporary shelters.

11      111.  Mr. Connell also observed drug use by some of the

12  residents of the temporary housing.  He has observed people in

13  those shelters lighting crack pipes, injecting drugs, and

14  drinking alcohol.

15      112.  These observations were also corroborated by separate

16  reports from his staff who were directed to clean up the area.

17

18      2.  Naomi's House

19      113.  Naomi's house is an overnight women's shelter for

20  single women.  Women must show up every night and leave in the

21  morning.  During the day the shelter is open for some limited

22  counseling, rehabilitation programs, and work placement programs.

23  They have 22 beds and 2 emergency beds.

24      114.  There are four full time counselors in the 24 bed

25  facility of Naomi's house as many of the clients who stay there

26  suffer from some form of mental illness and/or addiction.

27      115.  In addition to providing overnight care Naomi's house

28  also provides services such as first and last months rent

1   assistance and scholarships for job training programs.

2

3          3.   The Fresno Rescue Mission

4          116.   Fresno Rescue Mission is a men's only shelter with

5   between 120 and 150 beds.

6          117.   At the Fresno Rescue Mission single men must attend

7   Christian services as a condition for staying at the Mission.

8          118.   To be eligible for the Fresno Rescue Mission, family

9   heads must be married and the family must attend a Christian

10   religious service to stay there.

11

12          4.   The Village of Hope

13          119.   The Village of Hope is a temporary shelter for any

14   homeless individual, except children.  It is self-governed by the

15   people who live there.  They have two meetings a week that are

16   facilitated by the staff.  They have their own "city council"

17   that creates the rules, take care of their own security, and keep

18   the place clean.

19          120.   The Village of Hope has 44 beds.

20          121.   Originally the shelter was set up with two person

21   tents.  Now the tents have been replaced with ten-by-ten Tuff

22   sheds.

23          122.   The Village of Hope was not in operation in December

24   2003 because it had not yet been formed at that time.

25          123.   The Village of Hope did not operate at maximum

26   capacity over the summer of 2006.  Mr. Connell believes it

27   operated at between 50% to 60% capacity.

28          124.   Mr. Connell speculates that the Village of Hope has

34

not operated at full capacity because there are homeless
individuals who refuse to abide by the minimum rules required to
live in the Village of Hope.  These rules include no alcohol or
drug use on the property.

125.  The Village of Hope provides shelter for both men and
women.

126.  The City of Fresno did not provide funding for the
formation of Village of Hope but it assisted in fast-tracking the
permitting process to set up the initial tents.

127.  A requirement to live in the Village of Hope is that
the individual must complete a chore throughout the day.  If the
individual works, they may make arrangements for an evening
chore.

128.  During the day, individuals at the Village of Hope do
not have access to their shelter.

F.   Complaints by Residents and Business Owners About the
     Homeless

129.  The Fresno Police Department repeatedly receives
complaints about the temporary homeless shelters.  A number of
the calls relate to suspected criminal activity, suspected safety
issues, health issues, and private property owners concerned
about the use of their land.

130.  Captain Garner testified that none of the areas
cleaned up have been cleaned without the expression of such a
concern by the owner of the affected property.

131.  Over the last two years the City has received
complaints from Caltrans as well as the railroads.  According to

35

City testimony, Caltrans provided the City with a written authorization to enter onto Caltrans property and remove the temporary shelters.  The City was unable to produce evidence of such a written request from Caltrans.

132.  Caltrans is responsible for the disputed area along E Street.  The area involves mostly freeway embankments, freeway on-ramps and off-ramps.

G.   The City of Fresno's Response and Its Impact on the Homeless

133.  To address the concern for the criminal activity and drug use that was reported from these temporary shelters, Captain Garner contacted several service providers in the City to assist in addressing these problems.  The meeting took place in Captain Garner's office.

134.  The meeting between different representatives of the City, the County, and private service agencies was held to address the problems posed by temporary homeless shelters.  Some of the agencies included Caltrans, Social Security, the Department of Motor Vehicles, the Poverello House, the Rescue Mission, and County Social Services.

135.  At this meeting Captain Garner asked if there was a place that he could direct the homeless people to, or a place where these people may be able to go, upon moving them from the temporary shelters.

136.  The Poverello House volunteered to take the homeless people in and created the Village of Hope in response to the concerns addressed at the meeting.

137.  The City began its clean-up efforts and directed as

many people as they could to the Village of Hope and various other facilities.

138.   There is no other City-designated place or property where the homeless are directed.

139.   It is not standard practice of the City during clean-up efforts to arrest the homeless.

140.   There have been approximately 25 clean-ups each year since 2004.

H.   Efforts to Address Homeless Encampments by the Different City Agencies

1.   The City of Fresno

141.   City Manager Souza has oversight of approximately 3,800 City of Fresno employees.

142.   Mr. Souza reports directly to the Mayor.

143.   Mr. Souza is aware that temporary shelters have been present throughout the City, on Caltrans property, and on property owned by the Railroad.

144.   Any complaints that Mr. Souza's office receives are forwarded to the City of Fresno Police Department.

145.   Since the temporary restraining order issued against the City, based on Souza's investigation, he has recommended to the Mayor of the City of Fresno that the City cease its clean-up efforts.

146.   There is no City property allocated to the homeless.

2.   The Fresno Police Department

147.   Part of Captain Garner's duties include supervising

37

1  the Problem Oriented Policing ("POP") team in the Southwest

2  Policing District.   The purpose of the POP team is to investigate

3  locations that generate a large amount of police calls for

4  service.   The POP team tries to get to the root cause of those

5  issues to come up with some permanent solutions.

6       148.   Captain Garner supervises approximately 110 employees.

7  The geographic boundaries of his district include the northern

8  boundary of Shields Avenue, the southern boundary of North

9  Avenue, the eastern boundary of First Street and west to the City

10 limits.

11      149.   Captain Garner's jurisdiction includes a lower

12 socioeconomic profile.

13      150.   Through his work, Captain Garner has interacted with

14 many of the homeless service agencies including the Poverello

15 House, Marjorie Mason Center, the Rescue Mission, and Naomi's

16 House among others.

17      151.   Throughout the POP team's clean-up efforts, Captain

18 Garner has been present at over half of the clean-ups in the

19 City.   He has inspected the temporary shelters and interacted

20 with people living in the shelters.

21      152.   Captain Garner testified that the Fresno Police

22 Department did not direct the City sanitation workers in the

23 clean-up efforts, particularly as to what property to take or

24 destroy.

25      153.   Captain Garner testified that the Fresno Police

26 Department was present at the June 2006 clean-up and other clean-

27 ups for the sole purpose of preserving the peace.

28 ///

1          **3.   The City of Fresno Sanitation Department**

2          154.   The homeless clean-up efforts are not initiated by the

3    City Sanitation Department, according to Phillip Weathers.

4          155.   The Sanitation Department is contacted by Specialist

5    Wallace, an officer with the POP unit who is in charge of the

6    City's clean-up efforts.

7          156.   Phillip Weathers ("Weathers"), is a Community

8    Sanitation Supervisor One with the City of Fresno Sanitation

9    Department.  He is in charge of most of the clean-ups.

10         157.   To prepare for a clean-up, Mr. Weathers has a meeting

11   with staff to discuss the particulars of what location will be

12   cleaned, to ensure the staff has the necessary safety equipment,

13   and to review procedures with them.

14         158.   In 2006, the City Sanitation Department was involved

15   in approximately eight clean-up efforts.

16         159.   Mr. Weathers has been present for most of the clean-up

17   efforts.

18         160.   For each of the clean-up efforts Mr. Weathers

19   supervises between eight and fifteen sanitation workers on-site.

20         161.   The sanitation workers have the equipment necessary to

21   pick up large debris and trash but are not trained to handle and

22   dispose of bodily waste or other hazardous material present at

23   the temporary shelters.

24         162.   Typically the clean-up crew arrives at the site

25   between 8:30 a.m. and 9:00 a.m. so that homeless residents become

26   aware of Sanitation Department employees' presence and so they

27   know that clean-up efforts will take place.

28         163.   Before starting the clean-up, Mr. Weathers testified

that the sanitation workers wait for instruction from the Fresno Police Department on how to proceed with the clean-up efforts.

164.   This testimony contradicts Captain Garner's testimony that the extent of involvement by the Fresno Police Department in the clean-up efforts is to "preserve the peace," and that the Sanitation Department determines how to implement clean-up and what property to seize and destroy, not the police.

165.   Mr. Weathers testified that as the sanitation workers walk to a clean-up site, if there is a person who is gathering their belongings, the workers wait until all the belongings are gathered before they begin disposing of the debris.  He did not testify that City Police wait for homeless to take their property during a clean-up.

166.   Once individuals finish gathering their belongings, the sanitation workers begin to dispose of any material left behind.

167.   It normally takes sanitation workers an entire day to complete the clean-up efforts because they have to wait for homeless people to gather their belongings.

168.   Mr. Weathers has never asked his employees to inventory, take possession of, or store any property that is found during the clean-ups.

169.   Mr. Weathers estimates that if clean-ups included the inventory, possession, and storage of homeless peoples' property, it would take a week to complete each clean-up.

170.   City sanitation workers do not go through large containers of property, shopping carts, and boxes that are left unattended in the encampments during clean-up efforts.

1    171.   According to Mr. Weathers, the Fresno City Sanitation

2   Department does not have the budget, the resources, or the land

3   to store the property of the homeless.

4    172.   Mr. Weathers testified the City Sanitation Department

5   workers generally follow what the police department tells them to

6   do.  The City Sanitation Department follows the direction of the

7   Fresno Police Department during clean-up efforts.

8    173.   Under Mr. Weathers' supervision, he has seen the City

9   Sanitation Workers destroy perfectly functional shopping carts

10   during the City's clean-up efforts because they are "trash."

11    174.   The shopping carts are destroyed by the sanitation

12   workers according to direction of the Fresno Police Department.

13    175.   Mr. Weathers testified the City Sanitation Department

14   does not make an independent judgment about discarding the items,

15   including shopping carts, during their clean-up efforts.

16    176.   Mr. Weathers testified the Fresno Police Department

17   directs what goes into the garbage trucks, contradicting Captain

18   Garner.

19    177.   Mr. Weathers has also seen perfectly functional

20   bicycles destroyed during the clean-up efforts.

21    178.   The bicycles were destroyed because they were

22   abandoned and therefore are "trash."

23    179.   The bicycles were considered abandoned because there

24   was no owner present and were therefore considered trash.

25    180.   Perfectly functional bicycles with no owner present

26   are thrown into the City garbage truck and destroyed per the

27   instruction of the Fresno Police Department.

28    181.   Mr. Weathers admitted during testimony that "there are

1    functionally 'great things' out there [among] the 'trash.'   But
2    we still destroy it."

3        182.   The City sanitation workers have also destroyed neat
4    looking tents, where an owner obviously lives inside, but was not
5    home at the time of the clean-up efforts.

6        183.   The City Sanitation Department does not provide any
7    opportunity or ability for the owner of the property to come back
8    and reclaim the property.   Once the property is destroyed, it is
9    gone.

10       184.   In order to salvage the property without discarding or
11   destroying it, the clean-up crew would need trucks to move and
12   store the property.

13       185.   According to Mr. Weathers, while the City of Fresno
14   owns a number of trucks, it has no trucks available to assist
15   sanitation workers in the proper inventory, storage, and tagging
16   of homeless property.

17       186.   To obtain trucks from different City divisions or
18   departments, or for the City to rent trucks, would result in
19   additional "budget" costs to the City.

20       187.   Mr. Weathers has not investigated the cost of renting
21   a truck to assist in clean-up efforts.

22       188.   Mr. Weathers does not know of anyone else who has
23   investigated the cost of renting a truck to assist in clean-up
24   efforts.

25       189.   Mr. Weathers has not made any investigation to see
26   what other cities do to store the property of the homeless.

27       190.   Neither Mr. Weathers nor the City Sanitation
28   Department tried to figure out who used the destroyed property,

1  including the functional bicycle.

2  191.  For each clean-up, the Sanitation Department usually
3  prepares a week in advance to coordinate the equipment, the
4  personnel, Mr. Weathers' time, and the time of the Fresno Police
5  Department.

6  192.  A week's time is long enough to obtain the services of
7  a flatbed truck to assist in the clean-up efforts.

8  193.  The Fresno Police Department is always on-site during
9  the sanitation workers' clean-up efforts.

10

11  I.  <u>Reverend Harris' Volunteer Clean-Up</u>

12  194.  The volunteers in Rev. Harris' group ranged in age
13  from five years old to sixty years old and included the
14  Reverend's youngest son, as well as several youth.

15  195.  This group was also organized partly out of concern
16  and in response to the clergies and community members' witnessing
17  the police's response to the temporary shelters on television.

18  196.  On the day before the clean-up effort occurred,
19  Reverend Harris spoke with people living in the temporary
20  shelters to give them notice and request their assistance.  The
21  following day, his crew of volunteers showed up with shovels and
22  rakes.  They cleaned the areas from E Street to the Freeway 99
23  entrance.  The homeless individuals living in the temporary
24  shelters also assisted in clean-up.

25  197.  During his clean-up, Reverend Harris testified that he
26  did not find any unsanitary conditions or drug paraphernalia.
27  Also, he testified that he did not feel a threat to his health or
28  the health of his volunteers and did not feel the need to wear

1    biohazard suits.

2    198.   Reverend Harris testified that it was not necessary to
3    destroy any property in these clean-up efforts.

4    199.   Reverend Harris' volunteers have the ability to assist
5    in tagging and identifying property so it would not have to be
6    destroyed.

7    200.   Reverend Harris did not know about and was not invited
8    to the community meetings organized by Captain Garner.   Reverend
9    Harris testified that he was shocked to hear about the meetings
10   because he feels that his organization is one of the most visible
11   in the communities.

12

13   J.   The City of Fresno's Policy for the Disposal of Homeless
14        Property

15   201.   Specialist Wallace is a Problem Oriented Policing
16   ("POP") Unit officer in the City of Fresno's southwest district.

17   202.   As a POP officer, Specialist Wallace responds to
18   neighborhood disturbances, drugs, alcohol, homeless problems, and
19   special events in the downtown area.

20   203.   When Specialist Wallace gets a complaint involving the
21   downtown area, he will go out onto the streets to examine the
22   problem and to develop a solution for the problem.

23   204.   Over the last five years he has frequently experienced
24   complaints regarding the homeless in downtown Fresno.

25   205.   These complaints have caused him to become familiar
26   with the downtown area and its homeless individuals.

27   206.   In response to the complaints, he set up clean-ups
28   throughout the downtown area.

207.  Residents of the homeless temporary shelters are familiar with Specialist Wallace as a result of his frequent responses to the complaints involving homeless people in Fresno.

208.  In responding to the complaints, Specialist Wallace does not arrest the homeless individuals.  Instead he attempts to come up with ideas of what to do in order to alleviate the problems involving the homeless community.

209.  Residents of the temporary shelters ask Specialist Wallace where they can relocate.

210.  Specialist Wallace directs them to the local service providers, like the Poverello House and the Fresno Rescue Mission, but he does not direct them to another piece of vacant property in the City.

211.  During the clean-up efforts Specialist Wallace never makes an attempt to try and locate the owners of the property located within the areas of the clean-up effort.

212.  After the residents leave the temporary shelters Specialist Wallace testified that garbage and litter are all that is left behind.

213.  Sometimes there are shopping carts that are left behind.

214.  According to Specialist Wallace's testimony, he gives notice to homeless residents that they have to be with their property so the clean-up crew knows that the property is theirs.

215.  Specialist Wallace knows that homeless people store their possessions in shopping carts.

216.  These shopping carts contain personal property of homeless individuals.

1    217.   Specialist Wallace knows of no rule, code, or
2 regulation of the City that authorizes the treatment of abandoned
3 property as trash.  It was his idea.

4    218.   There is no statute in the State of California that
5 provides for designation of abandoned functional property as
6 trash.

7    219.   Per Specialist Wallace's clean-up policy, if homeless
8 property is unattended at the time of the clean-ups, it is
9 treated as abandoned and trash and the City will take the
10 property and dump it into the garbage truck for destruction.

11    220.   Specialist Wallace is the originator of this policy
12 that define unattended homeless property as abandoned and trash.
13 He alone devised and implemented this rule as an "out of the box"
14 solution to respond to complaints about Fresno's homeless.

15    221.   Shopping carts full of property and personal effects
16 are destroyed even if an advocate who is not the owner of the
17 shopping cart attempts to assert control over the cart on behalf
18 of the homeless owner.

19    222.   Under the clean-up policy, if someone has permission
20 to place the property on the location where it is found it may
21 still be considered abandoned and treated as trash.

22    223.   There are no written rules that Specialist Wallace is
23 aware of that govern the clean-ups by the City of Fresno.

24    224.   The City of Fresno is the only entity that Specialist
25 Wallace knows of that conducts these type of clean-up efforts.

26    225.   While other volunteer and service organizations have
27 conducted clean-ups, Specialist Wallace does not know whether any
28 of these organizations disposed of shopping carts or the property

1 | of the homeless.

2 | 226.  Captain Garner was unaware of any code or rule that
3 | provided for immediate seizure and destruction of the homeless'
4 | property.

5 | 227.  Mr. Souza also testified that it is City policy that
6 | if property is left unattended on the day of a clean-up, it is
7 | presumed to be abandoned and will be disposed of as trash.

8 | 228.  According to Mr. Souza, it is consistent with City
9 | practice that sanitation workers will remove unattended tents and
10 | shopping carts because they are considered trash after notice of
11 | the clean-up has been provided.

12 |

13 | **K.    The Fresno Shopping Cart Ordinance**

14 | 229.  The City of Fresno passed an ordinance in 2006
15 | governing the collection of stray shopping carts in the City.

16 | 230.  If the City of Fresno takes possession of unattended
17 | shopping carts as part of a clean-up effort, the shopping cart
18 | ordinance requires an effort be made to return the cart to its
19 | owner.

20 | 231.  The Fresno Police Department conducted an operation in
21 | October 2006 to collect stray shopping carts under the City's
22 | shopping cart ordinance.

23 | 232.  Captain Garner identified the officers who carried out
24 | the confiscation of the shopping carts, as members of the Fresno
25 | Police Department.

26 | 233.  The Fresno Police Department confiscated shopping
27 | carts on October 8, 2006, under the authority of the shopping
28 | cart ordinance.  Captain Garner does not have knowledge who the

shopping carts were confiscated from.

234.   The shopping carts were found in the southwest policing district and the officers who confiscated the shopping carts had Captain Garner's approval to confiscate them under the shopping cart ordinance.

235.   The shopping cart ordinance, however, was not in effect when the officers confiscated the shopping carts on October 8, 2006.

236.   That ordinance did not go into effect until October 27, 2006.

237.   Captain Garner does not know what happened to the carts confiscated on October 8, 2006.   Captain Garner does not know if the carts were returned to anyone.   Captain Garner did not follow up to find out.

238.   The Fresno Police Department did not have a procedure in place of notifying persons from whom carts were taken that there is a reclamation procedure for the carts.

239.   Captain Garner knows that the carts were not taken into custody by the Fresno Police Department or booked into evidence.

240.   Under the shopping cart ordinance it is City policy that if a cart is collected by the City and it has the name of the owner, the owner is notified about the missing cart.

241.   City personnel are not used to return the shopping cart to its rightful owner.

242.   The owner of a shopping cart is responsible for retrieval of the shopping cart.

243.   No evidence was offered that any of the shopping carts

1   were actually retrieved by their owners.

2

3   L.   Standing Order 3.18.12

4        244.   Standing Order 3.18.12 is an order that regulates the

5   Fresno Police Department's handling and booking of found

6   property.

7        245.   If property is found in the City of Fresno, Order

8   3.18.12 applies to it.

9        246.   There is no other order governing the handling and

10  booking of property as evidence.

11       247.   A shopping cart could be considered a large item

12  subject to the provisions of Order 3.18.12.

13       248.   Under this Order, the Fresno Police Department has a

14  procedure and policy that provides for taking in large pieces of

15  property.

16       249.   A bicycle found on the street in the City of Fresno

17  would fall under Order 3.18.12.

18       250.   Captain Garner agreed that it would have been possible

19  to store a functional bicycle found on the street under Order

20  3.18.12.

21       251.   Captain Garner claims that in order for the Fresno

22  Police Department to have stored a functional bicycle destroyed

23  during a clean-up under Order 3.18.12, they needed a "legal"

24  reason to take custody of the bicycle.

25       252.   Captain Garner testified that some legal reasons

26  include that the bicycle was not abandoned, if it is evidence of

27  a crime, or if it was reported as stolen.  He testified that none

28  of those reasons applied to the homeless clean-ups.

1   253.   There was nothing physically preventing the Fresno
2   Police Department from stopping destruction of a functional
3   bicycle other than Captain Garner's perception that they did not
4   have a "legal" reason to take it.

5   254.   Under provision 4.07 of Ordinance 3.8.12 there is
6   specific language for storing vendor carts.

7   255.   Shopping carts are not excluded from Order 3.8.12.

8   256.   Under the Order there is also a provision for holding
9   items of which the City of Fresno takes possession.

10   257.   When the Fresno Police Department confiscates an item,
11   it is held for safe-keeping for a certain period of time.

12   258.   However, the property taken during the clean-up
13   efforts in this case, including functional bicycles and shopping
14   carts, is dumped into a garbage truck and immediately destroyed.

15   259.   As a result, none of the owners of the property had
16   the opportunity to make a claim for the return of their property.

17   260.   The destruction of the property occurred during
18   Captain Garner's watch.

19   261.   Captain Garner testified that Standing Order 3.8.12
20   applies to property that the Fresno Police Department books, not
21   property that is destroyed.

22   262.   The Fresno Police Department does not book property
23   that is destroyed.

24   263.   Whether property is booked or destroyed under the
25   ordinance is within the discretion of the Fresno Police
26   Department.

27   264.   The failure to apply recognized law and City rules and
28   regulations of the City is without justification.

50

1  M.   **Further Evidence of The Destruction of Homeless Property**

2      **Under the City's Rule**.

3      1.   **General**.

4      265.   Lisa Apper has heard of homeless individuals who

5  recycle and while at the recycling place have had their things

6  taken by officers who claim to be enforcing a shopping cart

7  ordinance.   However, the entire property, not just the shopping

8  cart, is taken and destroyed.

9      266.   The encampments that the City has been dealing with

10  over the course of the last five months involved a range of 2

11  people to about 40 or 50 people.

12      267.   Captain Garner's general testimony that if a homeless

13  person wants to keep their property or take it with them, they

14  are allowed to do so is contradicted by specific testimony of

15  Apper, Williams, Kincaid, Thomas, Nelson, Garcia, and Deatherage

16  that they were not permitted to retain their property, all of

17  which was destroyed.

18      268.   Some of the clean-ups that Captain Garner has

19  witnessed have been completed in an hour or two.   Other clean-ups

20  take all day.   The ones that take longer are usually because the

21  owners of the property are given the opportunity to move or

22  relocate their property and that takes some time.

23      269.   The temporary shelters are normally located on private

24  property or property owned by another governmental agency.

25      270.   Captain Garner is not aware of any disciplinary action

26  taken against the officers that were present during the clean-ups

27  that are the subject of this litigation.

28      271.   The police department does not have a vested interest

1  in where homeless people go once they are asked to leave a
2  location based on complaints by property owners, as long as the
3  homeless go somewhere that they have a legal right to be.
4      272.   During the clean-up efforts Captain Garner testified
5  he directed the homeless to the local shelters and service
6  providers.   There was no other testimony on this subject.
7      273.   Captain Garner did not direct the homeless to relocate
8  to any other piece of property, sidewalk, or freeway underpass.
9      274.   The City of Fresno has no policy which allows for
10 owners of the unattended property to reclaim their property once
11 it is taken by the City during a clean-up effort.
12     275.   Destruction of the homeless' property is immediate and
13 irrevocable.
14     276.   Specialist Wallace admitted that if he came across a
15 tent with little to no debris and obvious signs that a person
16 lives there, he would still treat the tent as trash if the tent
17 is unattended and the resident was notified that a clean-up would
18 occur.   To the contrary, testimony showed that a bulldozer was
19 stopped just before razing a tent that had identification hanging
20 on the tent and was occupied by a man.
21
22      2.   2004 Clean Up Effort.
23     277.   The clean-up effort in early 2004 involved an
24 encampment with a population of approximately 150 to 200 people.
25     278.   Captain Garner observed the City Sanitation crews
26 perform their duties and interact with homeless individuals.
27     279.   Captain Garner testified that every person who
28 remained at the clean-up site was given an opportunity to leave

1   with whatever they wanted to take.  The homeless individuals were
2   then given the opportunity to pick up whatever they wanted to
3   take with them and left the area.

4       280.  After the homeless individuals cleared the area there
5   was still plenty of debris left behind that was cleaned up by
6   City sanitation workers.

7       281.  This practice is consistently followed.

8       282.  Captain Garner has never witnessed an instance where
9   an individual had their property destroyed over their
10  protestations.  This is directly contradicted by Ms. Apper's
11  testimony that he threatened her with arrest if she tried to
12  retrieve shopping carts for Ms. Thomas.

13

14      3.   <u>July 22, 2006 Clean Up</u>.

15      283.  Lisa Apper, a homeless advocate who works with the
16  Catholic Charities, first learned of the July 22, 2006, clean-up
17  from a homeless individual in one of her soup lines.  However,
18  Ms. Apper testified that there is confusion with the notice
19  because sometimes individuals are given notice of a clean-up and
20  the clean-up does not occur on the noticed time or date.

21      284.  At some later date, Ms. Apper saw a printed notice of
22  the clean-up effort to occur on July 22.  The written notice
23  pertained to a piece of property on the west side of E street.

24      285.  The clean-up effort took place on E street.  She
25  arrived at 7:45 in the morning on July 22.

26      286.  By the time Ms. Apper arrived, the City crews were
27  already present at the scene and making their way across to the
28  west side of the street toward the temporary shelters.  The City

1  crews were equipped with garbage trucks and bulldozers.

2      287.   In spite of its well known experience of working with

3  the homeless in Fresno, the Catholic Worker, Ms. Apper's

4  organization did not receive notice of the clean-up efforts by

5  the police.

6      288.   Ms. Apper testified that whatever verbal notice is

7  given by the City is confusing and often uncertain.   The City

8  says that they will come to clean-up on a given date or a given

9  time and they do not come on the noticed time or date.

10     289.   Among the items to be disposed of on July 22 were

11 three or four shopping carts that Ms. Apper attempted to save and

12 a tent with a person's identification card hanging from the

13 zipper.

14     290.   During the clean-up efforts Ms. Apper had an exchange

15 with Specialist Wallace of the Fresno Police Department.

16     291.   Specialist Wallace informed Ms. Apper that he was

17 there to dispose of the abandoned property and trash.

18     292.   Ms. Apper informed Specialist Wallace that the items

19 were not trash and were not abandoned.

20     293.   On July 22 there were several unattended shopping

21 carts present during the clean-up efforts.

22     294.   Ms. Apper verbally attempted to claim possession of

23 four shopping carts that she was watching for the owner.

24     295.   Ms. Apper was standing beside the carts, with her grip

25 on one of the carts.

26     296.   Specialist Wallace had a grip on the same cart Ms.

27 Apper held, to prevent her from pulling the cart away.

28     297.   Ms. Apper told Specialist Wallace that the carts had

owners.

298.   Specialist Wallace knew that the carts had owners and saw people's possessions stacked up neatly in each cart.

299.   In spite of this, City workers picked up all but one cart that Ms. Apper was holding and threw the carts in the back of the garbage truck, crushing them.

300.   After each of the carts was destroyed, except the one cart that Ms. Apper saved, Specialist Wallace went around the corner to Santa Clara street, across the street from the Poverello House, and destroyed more carts.

301.   Specialist Wallace did not keep count of how many carts were destroyed that day.

302.   No record of what property was destroyed was made by the City.

303.   During the June 22, 2006, clean-up, Specialist Wallace was also informed by a "keeper" of the carts that the owners of the carts were inside the Poverello house eating breakfast.

304.   Despite this information, the clean-up crews destroyed the carts.

305.   Specialist Wallace did not make an attempt to find out whether the owners of the carts were, in fact, at the Poverello house eating.

306.   It is not unusual for homeless people to store their belongings in a shopping cart.  Life on the street is precarious and the homeless must have their possessions ready to move at a moment's notice.

307.   Ms. Apper only saved one of the four shopping carts on July 22, 2006.

1    308.   Specialist Wallace did not attempt to only throw away

2  the items in the cart and salvage the cart.   The whole contents,

3  including each cart, were thrown into the garbage truck.

4    309.   Each of the carts that was destroyed contained several

5  personal items including boxes, blankets, sleeping bags, stuffed

6  animals, a broom and a dust pan.

7    310.   Ms. Apper knew the items were not abandoned.   The

8  property was not disheveled and there was no trash.   The blankets

9  were neatly folded.   The carts were kept orderly.   Everything was

10  neat and there was no sign of trash or neglect.

11    311.   The tent present at the scene on July 22 was also

12  thrown away.   There was no attempt to salvage the identification

13  card hanging from the zipper even though it was readily visible

14  to Ms. Apper and the City clean-up crew.

15    312.   There was no attempt made to check the identity of the

16  person on the identification card before the tent was thrown into

17  the dumpster.

18    313.   Captain Garner was also present at the scene on July

19  22, 2006 and was the commanding officer.

20    314.   Captain Garner did not do anything to prevent any

21  items from being destroyed.

22    315.   Captain Garner told Ms. Apper that she was obstructing

23  police business because she was trying to save the carts.   He

24  told her that she could go to jail.   This contradicts his

25  testimony and the City's position that persons who claimed

26  property at clean-ups were always permitted to take their

27  property.

28    316.   There was no effort by the clean-up crews to sort out

1    the valuable items from items that would be considered trash once
2    property was thrown into the dump truck.

3        317.   During the July 22, 2006, incident some people
4    attempted to save as much of their property as they could by
5    carrying it from the west side of E street where the clean-up was
6    occurring to the east side of E street.

7        318.   However, after cleaning the west side of E street, the
8    bulldozers then moved towards the east side of E street to clean
9    that up as well.  People were surprised because they thought that
10   their property would be safe on the east side of E Street.

11       319.   One of the homeless individuals who had her shopping
12   cart thrown away had only left it temporarily unattended with the
13   permission of Specialist Wallace.  She had gone to pick up her
14   recycling.

15       320.   The east side of E street does not contain any
16   residential housing.  It only contains a strip of dirt road.

17       321.   Ms. Apper offered to remove the belongings herself and
18   haul the property away but was not allowed to because the
19   officers told her it was trash and that they would discard it
20   themselves.

21       322.   Captain Garner does not deny that the destruction of a
22   perfectly functional bicycle was part of a clean-up effort that
23   the Fresno Police Department was in charge of in July 22, 2006.

24       323.   Captain Garner never told Specialist Wallace or any
25   other person at the clean-up effort to cease destruction of the
26   shopping carts.

27       324.   It is Captain Garner's testimony that if there is
28   property that is abandoned and is collected by the City's

1  sanitation workers it will likely be destroyed by them.

2

3      **4.   May 25, 2006 Clean Up.**

4      325.  Neither Ms. Apper nor the Catholic Worker received

5  notice of the May 25, 2006, clean-up.

6      326.  Ms. Apper found out about this clean-up after

7  receiving a phone call from a friend the morning that it was

8  scheduled to occur.  There was, however, a notice posted in front

9  of the Poverello House that gave information that anyone with a

10  shopping cart or sleeping between C & H and Fresno St. and Church

11  St. would be subject to citation and/or jail.  As a result, Ms.

12  Apper spent a few nights out on the street to see if that would

13  happen but it did not.

14      327.  The notice was from the police department but it did

15  not refer to any penal code section.

16      328.  On this date, Ms. Apper arrived at the clean-up site

17  at 7:30 in the morning.

18      329.  The City crews were on the northwest corner of Fresno

19  Street and E Street.

20      330.  Within ten minutes of Ms. Apper's arrival the

21  bulldozers came across the street with a City crew to clean up.

22      331.  Ms. Apper positioned herself between the bulldozer and

23  one of the tents to prevent the clean-up crew from destroying it.

24      332.  The officers on the scene expressed concern for her

25  personal safety and instructed her to move.

26      333.  Eventually the bulldozer went around her and proceeded

27  to clean up the remainder of the tents and property on the scene.

28      334.  After the bulldozer went around Ms. Apper and the tent

1  she stood in front of, the tent started to move and a person
2  emerged from within the tent.

3      335.   No one was aware that a person was in the tent because
4  the person was asleep underneath several blankets.

5      336.   Had Ms. Apper not stood in front of the tent the
6  person would have been scooped up along with the tent and his
7  personal safety would have been at risk.

8      337.   Clean-up crews were not checking inside the tents
9  before they seized and destroyed them.

10     338.   There was no attempt on this date to separate valuable
11 property from property that would be considered refuse.   Owners
12 of the property were not given a chance to retrieve their
13 property.

14

15     5.   August 26, 2006 Clean Up.

16     339.   This clean-up effort took place on E Street as it
17 turns into Santa Clara.

18     340.   On this date, after the clean-up concluded, the area
19 that was cleaned was fenced off with a temporary fence that had
20 razor wire.

21     341.   The purpose of the fence was to prevent homeless
22 people from placing their temporary shelters on an empty strip of
23 land along E Street.

24     342.   A homeless man named Walter, who was wheelchair bound,
25 resisted the relocation of his tent.

26     343.   Captain Garner spoke with Ms. Apper and the Catholic
27 Worker in hopes of them convincing Walter to move so that he
28 would not be taken to jail.

59

1    344.   Walter had a dog with him which made it difficult to

2  house him at any mission since the missions do not allow dogs.

3  Captain Garner arranged to relocate Walter and all of his

4  belongings to a new location on H Street.

5    345.   The temporary fence built on E Street has since been

6  replaced with an eight foot fence.

7    346.   There is no evidence of a written notice for the

8  August 26, 2006, clean-up effort.

9    347.   Ms. Apper testified that as a result of the clean-up

10  efforts and resulting relocation, homeless people are less

11  inclined to improve their homeless situation because the clean-

12  ups make them feel unwanted and unimportant.   According to Ms.

13  Apper, taking away and destroying a homeless person's last items

14  of personal property causes a lot of stress and anxiety because

15  they are left with nothing and have to accumulate new belongings

16  from scratch.

17

18  N.   The City of Fresno's Concerns.

19    1.   Health and Safety Concerns.

20    348.   Based on her knowledge of the homeless and their

21  shelters and property, Ms. Apper believes it was possible for the

22  City workers to move the tents and the rest of the property

23  without facing a health and safety threat.

24    349.   Upon looking inside the temporary shelters, Captain

25  Garner has seen a lot of collected material such as cardboard

26  boxes and materials that have been abandoned.   Captain Garner has

27  also seen evidence of drug use, human feces, and other hazardous

28  materials that they are concerned about.

1    350.   Captain Garner has made arrests of homeless people who
2 are under the influence of narcotics, robbery and sexual assault,
3 and has seen evidence of drug use in the encampments themselves.

4    351.   People who live near the temporary shelters have also
5 observed drug use and criminal activities.

6    352.   Out of the concern for the criminal activity and drug
7 use that was reported from these temporary shelters, Captain
8 Garner contacted several service providers in the City to assist
9 in addressing these problems.   The meeting took place in Captain
10 Garner's office.

11    353.   Captain Garner has personal knowledge that at least
12 one sanitation worker was pricked by a hypodermic needle that
13 stuck him while he was cleaning up an area like this.   This was
14 the only reported injury in fifty sweeps.

15    354.   The clean-up crew is not equipped with the proper
16 protective gear that would protect them from things like a
17 hypodermic needle stick.

18    355.   City sanitation workers are not trained and do not
19 have the equipment to inventory, take possession of, or store
20 individual items that are found during the clean-ups.

21    356.   Mr. Weathers believes that to inventory such material
22 would require sanitation workers to physically sort through each
23 individual item, and potentially become exposed to needle pricks,
24 human tissues, and other hazardous loose debris.

25    357.   As a City Sanitation Supervisor, Mr. Weathers is not
26 willing to direct his employees to go into that sort of hazardous
27 situation without the proper training and equipment.

28    358.   According to Mr. Weathers, the City of Fresno

1 Sanitation Department does not have the budget to train the
2 sanitation workers to conduct such clean-ups.

3    359.   Such training would result in increased costs to the
4 City.

5    360.   The City of Fresno Police Department has methods and
6 means for dealing with hazardous materials.   Fire Department
7 personnel are also trained in the hauling, storage, and disposal
8 of hazardous substances.   (Souza).

9    361.   In the regular course of their duties, the Fresno
10 Police come across drug paraphernalia such as hypodermic needles
11 and drug labs on a regular basis.

12    362.   The police have a duty in any criminal case where they
13 deal with suspected crime and criminals to identify, take custody
14 of, and to preserve evidence of crime, which includes physical
15 evidence, such as narcotics, paraphernalia, drug labs, weapons
16 and other property associated with criminal activity.

17    363.   The Fresno City Fire Department and, in some
18 instances, the City of Fresno Police Department are responsible
19 for dealing with hazardous materials.

20    364.   Members of both the Fire and Police Department receive
21 regular training in the handling, storage, disposal, and clean-up
22 of hazardous materials.

23    365.   The City of Fresno has agencies and departments that
24 regularly deal with hazardous materials.   The Souza testimony
25 belies the City's claims it has no expertise, personnel, or
26 resources to deal with the "hazardous materials" of the homeless.

27    366.   Specialist Wallace testified that the Fresno Police
28 Department has never attempted to remove hazardous materials of

1   the quantities similar to that left behind during the homeless

2   clean-up efforts.  He further testified Fresno Police Department

3   does not have the resources to do this.

4       367.   Specialist Wallace has never worked on hazardous

5   materials issues.

6       368.   Specialist Wallace is concerned about the health and

7   sanitation threats posed by the temporary shelters and the

8   exposure to those threats during the clean-up efforts.

9       369.   Specialist Wallace is not willing to sift through the

10  personal effects of homeless individuals during the clean-up

11  efforts.  Clean-up crews do not wear hasmat protective suits

12  during their clean-ups nor any other special equipment to conduct

13  the clean-ups aside from gloves and dust masks.

14      370.   The evidence establishes that the City has personnel

15  trained and competent to deal with hazardous materials, but chose

16  not to use this capability to deal with the property of the

17  homeless.

18

19          2.   <u>Budgeting Cost and Resource Concerns</u>.

20      371.   Mr. Souza has conducted a preliminary investigation

21  into whether the City has the ability to inventory and take

22  possession of City property.

23      372.   At this point in time Mr. Souza is not willing to

24  require staff to sort through and store homeless property at the

25  clean-up sites.

26      373.   Mr. Souza testified there is no location in the City

27  of Fresno that is appropriate for the storage of the homeless

28  property.

374.   In his investigations Mr. Souza looked into whether the City of Fresno has the staffing resources, the location, and the ability to monitor an inventory process for the property of the homeless.

375.   Mr. Souza concluded that the City does not have the resources to conduct such an inventory.

376.   Mr. Souza testified the City could, if it chose to, reallocate resources to implement an inventory and storage of homeless property.

377.   Mr. Souza estimated the cost to the City of inventorying property at approximately $50,000.  Currently the cost of the clean-ups is approximately $2,000 to $4,000.

378.   Mr. Souza testified that a spreadsheet showing the City's cost analysis was prepared in his investigation; no such spreadsheet was admitted into evidence.

379.   The city does not have a budget for the costs associated with implementing an inventory process for homeless property.

380.   The City is also concerned about risk management and increased litigation costs resulting from the potential mishandling of the property, were they to inventory and store, rather than destroy, the property.

381.   The City of Fresno has an annual budget of $856 million dollars.

382.   The City has a constant process of budgeting throughout the year.

383.   There have been frequent instances throughout the year when the City had to reallocate funds to provide for an

1  unanticipated cost.

2      384.   Mr. Souza testified that it would be a problem for the
3  City of Fresno to take possession and store the property of the
4  homeless.

5      385.   Captain Garner also testified that the City does not
6  have the capacity to collect the type of property that is
7  typically discovered in an abandoned shopping cart.  Most of the
8  time the officers come across the carts and they are filled with
9  items that do not fit in the back of a police car or the back of
10  a police pick-up truck.  The City does not have the storage
11  capacity for it.  It would be a burden.

12      386.   There are at least two trucks available in the City of
13  Fresno that could be used to transport the property of the
14  homeless.

15      387.   The City of Fresno Redevelopment Agency has vacant
16  land but Mr. Souza has not inquired as to whether such land could
17  be used for storage of homeless property.

18      388.   Mr. Souza has not studied alternative approaches by
19  other cities to problems created by the property of the homeless.

20      389.   The City of Fresno is also eligible for and receives
21  community development block grants from the federal government.

22      390.   The use of these grant funds is within the discretion
23  of the City Council.

24      391.   The City of Fresno has not applied for community block
25  grants or any other type of grants in the last five years to
26  address any issues of the homeless.

27      392.   The City also receives an annual grant of 8 million
28  dollars from the U.S. Department of Housing and Urban

1  Development.

2      393.  This grant can be used for any project or activity
3  impacting high poverty areas.  It is used for community policing.

4      394.  None of the HUD grant money has been used in the
5  homeless clean-up efforts.

6      395.  All of the HUD grant money has been allocated for the
7  2006-2007 year.

8      396.  No evidence was offered as to what specific programs
9  that money was allocated for.

10      397.  Mr. Souza testified that the HUD money was used for
11  general housing projects, community policing operations, code
12  enforcement, and specific projects that eligible community groups
13  apply for.

14      398.  In order to reallocate any of the $8 million in HUD
15  grant funds during the fiscal year, the City must submit an
16  application for modification to the Department of Housing and
17  Urban Development.

18      399.  The appropriation that the City of Fresno has adopted
19  for the current fiscal year does not include any amount for the
20  costs of collecting and storing the property of the homeless.

21      400.  The City will receive another $8 million HUD grant
22  next year.

23      401.  If the City chose, it could in the next fiscal year,
24  include an allocation to specifically address issues that arise
25  regarding homeless temporary shelters throughout the City.

26      402.  The City of Fresno does not identify any place where
27  the homeless can go after a clean-up.  The homeless are left to
28  determine that on their own.

66

1    403.   Mr. Souza has been informed about complaints to the
2  City regarding the temporary shelters through meetings with staff
3  and other internal City communications.

4    404.   No minutes of these meetings were submitted into
5  evidence.

6

7  **O.   The Balance Of Hardships**.

8    405.   The type of property of the homeless that the City has
9  confiscated and immediately destroyed pursuant to its policy and
10 practice includes property that is unique and irreplaceable, for
11 which monetary damages cannot compensate and are not a full and
12 adequate remedy.   Examples of this property include the shelter
13 of homeless individuals, their medications, identification
14 documents, other important documents, irreplaceable family
15 heirlooms, photos, birthday cards, personal letters, pets, a lock
16 of a child's hair, and an urn containing the remains of a
17 grandchild.

18   406.   The City's destruction of the property of the homeless
19 has a devastating effect on the dignity of homeless people, who
20 live a precarious existence and then are knocked down even lower
21 from this destruction.   (RT vol. II, 126, Nov. 16, 2006)
22 (Kincaid).

23   407.   The homeless experience severe, lasting mental anguish
24 due to the destruction of their remaining possessions and the
25 Court finds that the adverse impact on the sense of dignity and
26 hope of the homeless, and correspondingly their ability to
27 improve their condition, is substantial.   (*See* RT vol. II, 17,
28 47, 91, 127, Nov. 16, 2006) (Tomas, Deatherage, Williams and

1  Kincaid).

2       408.   The City's policy of seizure, confiscation, and
3  immediate destruction of the property of the homeless, including
4  clothes and hygiene items, affects a homeless person's ability to
5  obtain and maintain employment which, in turn, is important to
6  their effort to end their condition of homelessness.  (RT vol.
7  II, 43, 93, Nov. 16, 2006) (Deatherage and Williams).

8       409.   The City's destruction of the property of the
9  homeless, including shelter, blankets, clothes, food and
10  medication, makes it more difficult for the homeless to survive.

11      410.   The City's destruction of the property of the homeless
12  under the conditions in evidence has been undertaken without
13  regard to legal analysis and the City provided no specific legal
14  authority for its policies and practices at dispute in this case.

15      411.   On August 5, 2006, Rev. Floyd Harris organized a group
16  of volunteers to clean and weed the area of E Street and Ventura,
17  where several homeless people lived.  The volunteer group
18  included homeless members of the community.  During the clean-up,
19  the volunteers found no feces or drug paraphernalia in the area.
20  The volunteers cleaned the area without destroying any property.
21  (RT vol. I, 128-36, Nov. 7, 2006; Harris Ex. 1) (Harris).  This
22  is evidence that it is possible to effect a cleaning of an area
23  where homeless reside without the necessity of confiscating and
24  immediately destroying the property of the homeless.

25      412.   The City contends that storing homeless people's
26  property as an alternative to immediate destruction would place
27  City workers at a health risk.  (RT vol. III, 15, Nov. 17, 2006)
28  (Souza).  However, the Fresno Police Department's procedure for

evidence handling and property booking, provides for the handling of hazardous materials, evidencing that there are City personnel who know how to and are equipped to handle such materials. (Garner Ex. C, 7).  Some City employees, police and fire personnel, are already trained in the handling of such materials. According to Mr. Souza, expenditures in the range of $50,000 would cover not only adequate training of additional City workers, but also any additional materials and resources they would need to deal with property of the homeless, establishing that such training is possible, contrary to the City's opposition position initially advanced.  (RT vol. III, 30, Nov. 17, 2006) (Souza).

413.  Evidence shows that other cities and one state in the United States have developed procedures for handling and storing the property of homeless people, other than by immediately destroying the property.  (Ozdeger Ex. A; Pls. Ex. A).  The City has not explored any such alternatives.  (Testimony of Andrew Souza, Nov. 22, 2006).

414.  The City's annual budget including capital is $856,000,000.  While the budget is allocated annually, the City admits that it is possible to change the budget to reallocate funds during any fiscal year.  (RT vol. III, 28-29, Nov. 17, 2006) (Souza).

415.  The City estimated that it would cost in the range of $50,000 if it were required to change its practice, train staff and provide materials to take and store homeless people's property instead of destroying it.  The City currently owns trucks and other equipment that could be used to store rather

than destroy the property of the homeless, but has not provided any estimate of any additional cost to perform more steps.  (RT vol. III, 15-16, Nov. 17, 2006; *see also* Testimony of Phillip Weathers, Nov. 17, 2006) (Souza).

416.  For example, the City of Fresno owns over one hundred trucks, the majority of which are used every day.  However, one or two trucks of the type needed would be available to assist with relocating homeless people's property, at no additional cost to the City.  (RT vol. III, 31-32, Nov. 17, 2006) (Souza).

417.  The City asserts that storing homeless people's property as an alternative to immediate destruction, would expose the City to possible litigation expenses due to the risk of giving stored property to a person other than the rightful owner. (RT vol. III, 18, Nov. 17, 2006) (Souza).  However, the City provided no quantification or estimate of the value or cost of this risk and, other than this case, has cited to no actual litigation brought against the City by homeless persons regarding their property.

418.  The City has identified no area in the City where the homeless can go nor has the city itself provided shelter or any place for the homeless or their property.  (RT vol. III, 32-33, Nov. 17, 2006) (Souza).

419.  Based on all the evidence, the Court finds that the City has the ability to retain and store rather than immediately destroy, during sweep, the property of the homeless at a reasonable cost and effort.

420.  Based on all the evidence, the Court finds that storing and maintaining rather than destroying, the property of

1  the homeless is possible and within the ability of the City,

2  although the City chooses not to do so for the reasons stated by

3  Mr. Souza and other City witnesses.

4

5  III.   CONCLUSIONS OF LAW

6  A.   Context of the Decision

7  1.   As stated in open court, the Court extends respect and

8  comity to coordinate branches of government, the Legislature and

9  the Executive.   The Court will not presume to tell elected

10  officials of the City of Fresno how to address and resolve

11  problems presented by the homeless.   The power to tax and spend

12  is the province of the Legislature and the Court cannot direct

13  the City of Fresno how to allocate or utilize its fiscal

14  resources.

15  2.   The Executive branch of the City, the Police Department

16  and Department of Sanitation are experts in the fields of

17  addressing health and safety risks.   The Court will not direct

18  nor is it qualified to order how or by what methods issues

19  concerning problems of the homeless and their property should be

20  addressed and solved nor what person, power, methods, or

21  resources are to be utilized in the enforcement of the laws and

22  protection of the health and safety of the community.

23  3.   The Court's function is limited to addressing the legal

24  claims that the Constitutional rights of the Plaintiffs are being

25  violated by adopted and implemented policies, patterns and

26  practices of the City of Fresno in seizing and immediately

27  destroying the property of the homeless.

28

71

**B.**   Standards for Issuance Of Injunctive Relief.

4.   Injunctive relief is an equitable remedy that considers the likelihood of success on the merits and the nature of harm caused by challenged conduct. *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). The purpose of a preliminary injunction is to maintain the relative positions of the parties until a trial on the merits is held.

5.   Under the traditional test, a plaintiff must show the following for injunctive relief: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable harm to the plaintiff if injunctive relief is not granted; (3) a balance of hardships favoring the public; and (4) advancement of the public interest in certain cases. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005). In the alternative, a court may grant injunctive relief if Plaintiff "demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* at 1120.

**C.**   Likelihood Of Success On The Merits Unlawful Seizure.

6.   The Fourth Amendment to the United States Constitution protects against unreasonable seizures and searches. *Menotti v. City of Seattle*, 409 F.3d 1113, 1152 (9th Cir. 2005). Similarly, Article I, Section 13 of the California Constitution provides in part that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches may not be violated . . . .," a provision that

1   provides at least as much protection as does the Fourth

2   Amendment.  *See People v. Brisendine*, 13 Cal.3d 528, 548-52

3   (1975), *abrogated on other grounds as discussed in In re Lance*

4   *W.*, 37 Cal.3d 873, 879 (1985).

5        7.   A seizure for Fourth Amendment purposes occurs when

6   there is some meaningful interference with an individual's

7   possessory interest in property.  *Soldal v. Cook County, Ill*, 506

8   U.S. 56, 63 (1992).  An officer who comes across an individual's

9   property in a public area may seize it only if Fourth Amendment

10   standards are satisfied - for example, if the items are evidence

11   of a crime or are contraband.  *Id.* at 68.

12        8.   As the Ninth Circuit recently further explained:

13        Reasonableness is the touchstone of any seizure under
        the Fourth Amendment.  Thus, to comply with the Fourth

14        Amendment, the seizure . . . must have been reasonable
        under the circumstances.  We look to the totality of

15        the circumstances to determine whether the destruction
        of property was reasonably necessary to effectuate the

16        performance of the law enforcement officer's duties.  A
        seizure becomes unlawful when it is "more intrusive

17        than necessary."  To determine whether the [given
        seizure] was reasonable, we balance the nature and

18        quality of the intrusion on the individual's Fourth
        Amendment interests against the countervailing

19        governmental interests at stake.

20   *San Jose Charter of the Hells Angels Motorcycle Club v. City of*

21   *San Jose*, 402 F.3d 962, 975 (9th Cir. 2005).

22        9.   The City's policy and practice in dealing with the

23   homeless, as implemented, effects seizures of homeless

24   individuals' property.  The interference with Plaintiffs'

25   possessory interests is more than just "meaningful;" it is total

26   and irrevocable, since the City seizes and then immediately

27   destroys all of the property that it seizes in its sweeps.  *Id.*

28   at 975 ("[t]he destruction of property by State officials poses

1   as much of a threat, if not more, to people's right to be 'secure
2   in their effects' as does the physical taking of them.").

3       10.   Such seizures, which result in the irrevocable
4   destruction of homeless persons' property, are also "more
5   intrusive than necessary" and therefore unlawful.  *Id.*  The City
6   conducts its seizures in a highly intrusive manner, by
7   immediately destroying the property and thus permanently
8   depriving the homeless owners of their property.  The City makes
9   no effort to separate and or store for later retrieval items that
10  are clearly owned and are valuable, not trash.  Rather, the
11  City's policy is to immediately seize and destroy all property in
12  the area of the sweeps, without regard to the nature or value of
13  the property.

14      11.   The City's sweeps are not confined to seizure and
15  destruction of property that is evidence of a crime or
16  contraband, or that presents immediate threats to public health
17  or safety.  Even when homeless people inform City workers that
18  they have been granted permission to keep their belongings where
19  they are, the City seizes and destroys the property regardless.
20  This policy and practice of seizure and destruction without just
21  cause violates the Fourth Amendment and the concomitant
22  protections against unlawful seizure found in the California
23  Constitution.

24      12.   The City has attempted to justify its policies and
25  practices by its rule that the property of the homeless that it
26  seizes and destroys is "abandoned" and is therefore "trash."  The
27  City's "rule," developed by Specialist Wallace and adopted by the
28  City Police Department Sanitation Department, and City Manager,

1  is that if a homeless person is not literally beside his or her

2  property laying claim to it during a sweep, then the City deems

3  that property to be abandoned, making the property "trash," which

4  is then destroyed.   There is no legal justification for this rule

5  which is demeaning as it places no value on the homeless'

6  property and is not honest because the "rule" purports to

7  transmogrify obviously valuable property into trash.

8      13.   In California, as under the common law, an item is the

9  property of its owner unless the owner intentionally and

10 voluntarily abandons it because "she simply no longer desires to

11 possess the thing being abandoned."   1 Cal.Jur.3d Lost and

12 Escheated Property, Sec. 2; *See Katsaris v. United States* 684

13 F.2d 758, 761-62 (11th Cir. 1982).   Here, the evidence

14 demonstrates that Plaintiffs did not intend to abandon their

15 tents, carts, clothing, bicycles, personal effects, memorabilia,

16 and other property that they need to survive, and no reasonable

17 official could believe this to be the case.   Nor can the City

18 treat property as abandoned and trash just because the owner has

19 not removed it in the time the government has allotted.   *A & W*

20 *Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1111 (9th

21 Cir. 1998).

22     14.   The City's purported desire for clean and safe streets

23 does not make its conduct lawful.   Protection of the public does

24 not require the wholesale seizure and immediate destruction of

25 all Plaintiffs' possessions and in any event "is outweighed by

26 the more immediate interests of the plaintiffs in not having

27 their personal belongings destroyed."   *Pottinger v. City of*

28 *Miami*, 810 F.Supp. 1551, 1573 (S.D. Fla. 1992).

15.   The City's seizure of homeless people's personal property without probable cause and the immediate and permanent destruction of such property without a method to reclaim or to assert the owner's right, title, and interest to recover such personal property violates the Fourth Amendment to the United States Constitution and Art. I, § 13 of the California Constitution.

D.   **Failure To Provide Due Process**.

16.   The Fourteenth Amendment to the United States Constitution provides that "No state shall . . . deprive any person of life, liberty, or property, without due process of laws."  United States Const. Amend XIV.  Article 1, section 7(A) of the California Constitution similarly provides that "[a] person may not be deprived of life, liberty, or property without due process of law . . . ."  In this case, the City is subject to the Fourteenth Amendment.

17.   Plaintiff's personal possessions, which in many cases represent most of what they own, undoubtedly constitute "property" for purposes of constitutional analysis.  *Fuentes v. Shevin*, 407 U.S. 67, 84 (1972).  "[A] homeless person's personal property is generally all he owns; therefore, while it may look like "junk" to some people, its value should not be discounted."  *Pottinger*, 810 F.Supp. at 1559 (one person's trash is another person's treasure).

18.   Before the government seizes an individual's property, even temporarily, it must provide notice and an opportunity to be heard prior to the seizure, except in "extraordinary situations

1   where some valid governmental interest is at stake that justifies

2   the postponing of the hearing until after the event." *United*

3   *States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993).

4   Pre-seizure notice is not dependent upon the value of the

5   property. *Fuentes v. Shevin*, 407 U.S. at 84-87; *Propert v.*

6   *District of Columbia*, 948 F.2d 1327, 1334 (D.C. Cir. 1991)

7   (government must provide adequate notice to owners of parked cars

8   before it tows them as "junk.").

9       19.   The basic requirements of procedural due process are a

10  right to notice and an opportunity to be heard at a meaningful

11  time and in a meaningful manner. *Matthews v. Eldridge*, 424 U.S.

12  319, 339-43 (1976).  When a protected property interest is

13  threatened, a court must consider three factors to determine

14  whether the basic requirements of procedural due process have

15  been met:

16          [f]irst, the private interest that will be affected by
            the official action; second, the risk of an erroneous
17          deprivation of such interest through the procedures
            used, and the probable value, if any, of additional or
18          substitute procedural safeguards; and finally, the
            Government's interest, including the function involved
19          and the fiscal and administrative burdens that the
            additional or substitute procedural requirement would
20          entail.

21      20.   Here, the process provided by the City is

22  constitutionally inadequate, particularly in light of the fact

23  that the City is seizing from homeless people the very

24  necessities of life: shelter, medicine, clothing, identification

25  documents, and personal effects of unique and sentimental value.

26  The City offered limited evidence of any written pre-deprivation

27  notice; the only written notice actually produced by the City at

28  the hearing was affirmatively misleading in that it gave the

1  incorrect date for when the "clean-up" operation was to occur.
2  There was some evidence of oral notice before some of the City's
3  sweeps.   (Testimony of Captain Garner, Specialist Wallace and Mr.
4  Connell).   This too was inconsistent, as a number of Plaintiffs
5  and witnesses described confusion and a lack of response to the
6  oral notice, establishing that the notice procedure is not
7  effective.

8       21.   Moreover, the City provides no post-deprivation remedy
9  of any sort, as all property is summarily destroyed on the spot
10 once it is seized.   "[T]he State may not finally destroy a
11 property interest without first giving the putative owner an
12 opportunity to present his claim of entitlement."  *Logan v.*
13 *Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982); *see also Propert*,
14 948 F.2d at 1335 ("Although [a municipality] may have a strong
15 interest in the prompt removal of supposed junk vehicles from the
16 streets, its interest in the immediate destruction of such
17 vehicles is far from apparent."); *Schneider v. County of San*
18 *Diego*, 28 F.3d 89 (9th Cir. 1994); *Wong v. City & County of*
19 *Honolulu*, 333 F.Supp.2d 942, 945 (D. Haw. 2004).

20      22.   The City's process, or lack thereof, creates not just
21 the risk, but the certainty of erroneous deprivation.   The City
22 could reasonably provide a more effective process that would
23 reduce the likelihood of erroneous deprivation.   For example, any
24 written notice should be given consistently and sufficiently in
25 advance of any planned operation, publicly posted and if
26 practicable affixed to any specific property at issue, and
27 simultaneously given to service providers in the immediate area.
28 The notice should be written in a manner reasonably calculated to

be understood by the affected parties and should include a clear
and unambiguous statement of the nature and purpose of the action
to be taken, the legal authority for such action, the specific
location where the action is to be taken, and the date and time
of the action.   There should also be a post-deprivation process,
described in the notice, to be followed to reclaim any personal
property that is seized.   *See* Cal. Civ. Code §§ 2080 *et seq*.

23.   In the absence of effective and adequate pre- or post-
deprivation process, the City's seizure and immediate destruction
of homeless people's personal property violates the Fourteenth
Amendment to the United States Constitution and Art. I, §§ 7(A)
and 13 of the California Constitution.

E.   <u>Other Relevant Legal Authority</u>.

24.   Other district courts that have applied constitutional
protections in the context of homeless people's property
interests have reached similar conclusions.   *Pottinger v. City of
Miami*, 810 F.Supp. 1551, 1556 (S.D. Fla. 1992), cited with
approval in *United States v. Gooch*, 6 F.3d 673, 677 (9th Cir.
1993), found Fourth Amendment and Due Process violations and
issued injunctive relief where City of Miami employees, in
addressing the City's "homeless problem," routinely seized and
destroyed the possessions of homeless people by use of front-end
loaders and dump trucks, where such property included personal
identification, medicine, clothing, and a Bible, and where the
City threatened with arrest those who attempted to retrieve
belongings.   Although the Court found that the City had an
interest in keeping areas sanitary, orderly, and law-abiding,

1   such interests did not outweigh or justify violations of

2   fundamental Constitutional rights under the Fourth, Fifth and

3   Fourteenth Amendments to the United States Constitution.  The

4   Court observed that the value of personal property of homeless

5   people "is in the eye of the beholder, as one man's junk is

6   another man's treasure."  *Id.* at 1556.  The *Pottinger* case is

7   persuasive authority.

8       25.  In *Justin v. City of Los Angeles*, CV012352 LGB AIJK,

9   2000 WL 1808426 (C.D. Cal. Dec. 5, 2000), the Plaintiffs, who

10  were homeless individuals, charged the Los Angeles Police

11  Department and other City officials with unlawful searches and

12  seizures, including the destruction of the homeless person's

13  personal property.  In rejecting the City's argument that it had

14  a greater right to keep its streets safe and clean, the *Justin*

15  court issued injunctive relief, holding:

16          Here, Defendants may be slowed in their efforts to keep
            the City, and especially the downtown area, clean and
17          safe.  This injunction may disturb their new initiative
            to revitalize and uplift communities, to improve the
18          streets and sidewalks, and to diminish the crime rate.
            Plaintiffs, however, risk a greater harm if the
19          injunction is not granted: the violation of their
            First, Fourth, and Fourteenth Amendment rights.  *Id.* at
20          *11.

21  The *Justin* case is also persuasive authority.

22      26.  The district court in the unpublished decision of *Love*

23  *v. City of Chicago*, 1996 WL 627614 (N.D. Ill. 1996), relied on by

24  Defendants here, found no constitutional violations based on the

25  very different facts presented in that case.  In *Love*, the city

26  had established a written procedure for sweeps that provided for

27  at least three separate notices, and two additional forms of

28  notice when possible.  *Id.* at *3-*4.  There was no evidence that

1   the city would seize belongings that homeless people or their
2   colleagues wished to move or that any property claimed by persons
3   who were present had been lost under this procedure.  *Id.* at *4.
4   City workers would save and inventory certain items of value so
5   that the owner could reclaim them.  *Id.*  By contrast, here the
6   City of Fresno fails to provide adequate notice and seizes and
7   immediately destroys any unattended property, even if it is
8   clearly someone's personal possessions.  Under the City's policy,
9   homeless people have lost personal property and will continue to
10  lose such property absent Court intervention.  The *Love* case is
11  distinguishable on its facts.  To the extent that any part of the
12  *Love* decisions' legal analysis leads to a different result on the
13  facts here, the analyses of the *Pottinger* and *Justin* cases are
14  more compelling and persuasive.

15

16  **F.    Balance Of Hardships**.

17       27.    The balance of hardships weighs heavily in favor of
18  Plaintiffs.  Plaintiffs' interest in protecting against unlawful
19  seizure and immediate, irrevocable destruction of their personal
20  property including the loss of constitutional rights, in itself,
21  an injury that the law will not tolerate, *Associated Gen.*
22  *Contractors of Cal. v. Coalition for Econ. Equality*, 950 F.2d
23  1401, 1412 (9th Cir. 1991); *Guiterrez v. Mun. Ct.*, 838 F.2d 1031,
24  1045 (9th Cir. 1988), *vacated as moot*, 490 U.S. 1016; *Citicorp*
25  *Servs., Inc. v. Gillespie*, 712 F.Supp. 749, 753 (N.D. Cal. 1989);
26  is balanced against the City's interest in reducing health and
27  safety concerns and protection of private property from trespass
28  by the homeless, which can be protected against without such

1    immediate destruction of property.

2         28.   The evidence adduced demonstrates that the City's

3    destruction of homeless people's property causes a variety of

4    other significant, legally cognizable harms.   In the City's

5    operations, homeless people lose medicine and health supplies;

6    tents and bedding that shelter them from the elements; clothing

7    and hygiene supplies; identification documents and other personal

8    papers; the tools by which they try to make a meager income; and

9    items of immeasurable sentimental value.   The irreparable harm

10   from the City's practices also includes the harm to homeless

11   people's security and dignity.

12        29.   On the other side of the balance lies the City's

13   purported need to seize and destroy homeless people's property as

14   part of its law enforcement or sanitation efforts to keep the

15   City clean and safe.   The City is free to enforce the laws,

16   remove homeless people from private property or other areas if

17   they are unlawfully present or congregating there, and can

18   otherwise enforce public health and safety laws, including

19   criminal laws necessary to protect the public, if there is

20   probable cause to believe such laws are being violated.

21   Similarly, the City can keep its streets clean without the

22   wholesale immediate destruction of the personal property of

23   homeless people.   It is not the Court's place to direct the City

24   how to do so.   Preliminary injunctive relief will in no way

25   hinder the City's necessary law enforcement efforts to fully

26   protect the public in addressing any violations of City

27   ordinances, State or Federal law by homeless individuals.   Even

28   actual violations of local or State laws do not per se justify

1 the immediate wholesale destruction of Plaintiffs' personal
2 property, even with respect to items the police deem contraband.
3 The court does not presume to suggest how the City should
4 allocate its resources and enforce the law.

5      30.  The City's assessments of the cost and risk assessments
6 associated with storing property that is seized, rather than
7 immediately destroying it are inadequate.  Even if upholding the
8 legal rights of homeless people could result in some cost to the
9 City, that is the price of living in a civilized society.  The
10 City's speculated cost is insufficient to tip the balance of
11 hardships in its favor because, "while cost to the government is
12 a factor to be weighed in determining the amount of process due,
13 it is doubtful that cost alone can ever excuse the failure to
14 provide adequate process." *Propert*, 948 F.2d at 1335.

15      31.  The public interest is served in the interim by
16 issuance of preliminary injunctive relief to maintain the status
17 quo.  The injunction will prevent the City from seizing the
18 personal property of homeless persons without lawful cause and
19 from immediately destroying any property it seizes, pending a
20 trial in this matter or further order of the Court.  If the City
21 needs to conduct sweeps or take other law enforcement actions
22 against homeless individuals in the interim period, the City will
23 not suffer undue hardship in having to retain property seized to
24 afford due process, as opposed to the immediate irrevocable
25 destruction of the Constitutional rights and property of affected
26 homeless individuals.

27 ///
28 ///

1

**G.**     **Bond**

2         32.   Plaintiffs have no assets and cannot reasonably post a

3  bond even if one were justified in this case or if Defendants so

4  requested.   A bond requirement shall not be imposed.   *See, e.g.,*

5  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("We

6  have recognized that Rule 65(c) invests the district court with

7  discretion as to the amount of security required, *if any*.")

8  (quotation marks omitted) (emphasis in original).   Plaintiffs are

9  destitute and cannot afford to pay for a bond.   *See e.g.,*

10 *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 385 n.42 (C.D. Cal.

11 1982) (waiving bond where action was brought by destitute

12 plaintiff); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir.

13 1999) (waiving bond where vast majority of plaintiffs were "very

14 poor").   Further, there is "no realistic likelihood of harm to

15 the defendant[s] from enjoining [their] conduct."   *Jorgensen*, 320

16 F.3d at 919.

17

18 **H.**     **Preliminary Injunction**

19         33.   To prevent the violation of Plaintiffs' Fourth and

20 Fourteenth Amendment rights under the U.S. constitution and Art.

21 I §§ 7 and 13 of the California Constitution, a preliminary

22 injunction shall issue in the form set forth in Exhibit A,

23 attached hereto and by this reference incorporated in these

24 Findings.

25         TO THE EXTENT ANY FINDING OF FACT COULD BE INTERPRETED AS A

26 CONCLUSION OF LAW OR ANY CONCLUSION OF LAW COULD BE INTERPRETED

27 ///

28 ///

1   AS A FINDING OF FACT, IT IS SO INTENDED.

2

3   SO ORDERED.

4   DATED:   December 8, 2006.

5
                                    /s/ Oliver W. Wanger
6                        _____
                                   Oliver W. Wanger
7                        UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21                                 EXHIBIT "A"
22
23
24
25
26
27
28

1

2

3

4

5

6                     UNITED STATES DISTRICT COURT

7                     EASTERN DISTRICT OF CALIFORNIA

8

9   PAMELA KINCAID, DOUG DEATHERAGE, )      1:06-cv-1445 OWW SM
    CHARLENE CLAY, CYNTHIA GREENE,   )
10  JOANNA GARCIA, AND RANDY         )      PRELIMINARY INJUNCTION
    JOHNSON, INDIVIDUALLY ON BEHALF  )
11  OF THEMSELVES AND ALL OTHERS     )
    SIMILARLY SITUATED,              )
12                                   )
                 Plaintiffs,         )
13                                   )
         v.                          )
14                                   )
    CITY OF FRESNO, CALIFORNIA       )
15  DEPARTMENT OF TRANSPORTATION,    )
    ALAN AUTRY, JERRY DYER, GREG     )
16  GARNER, REYNAUD WALLACE, JOHN    )
    ROGERS, PHILLIP WEATHERS AND     )
17  WILL KEMPTON, INDIVIDUALLY AND   )
    IN THEIR OFFICIAL CAPACITIES;    )
18  DOES 1-100, INCLUSIVE,           )
                                     )
19               Defendants.         )
                                     )
20  _____)

21

22       The Plaintiff's Application for a Preliminary Injunction was

23  heard on November 7, 16, 17, and 22, 2006, at which testimony was

24  taken, exhibits received into evidence, and arguments of counsel

25  were presented and fully heard.  Based on the accompanying

26  Findings of Fact and Conclusions of Law; good cause having been

27  shown and the requisite equitable standards for injunctive relief

28  satisfied, the following Preliminary Injunction is issued:

                                 87

1.    Pending further order of this Court or trial of this matter and the ruling on Plaintiffs' Complaint for permanent injunction, the City of Fresno, its Police Department, Sanitation Department, and all those acting for, under or in concert with them, or who have actual notice of this order, are enjoined from seizing and immediately destroying the property of homeless persons, absent probable cause to believe that the property is evidence of a crime, contraband, or presents an immediate threat to public health or safety; unless the City provides constitutionally adequate notice and a meaningful opportunity to be heard concerning the seizure and destruction of such personal property before the property is destroyed;

2.    Absent an immediate threat to public health or safety, any property of the homeless that is seized that is not hazardous or contraband, may not be destroyed without prior written notice that such property will be seized and destroyed and a constitutionally adequate pre- or post-deprivation remedy provided to recover such property.


SO ORDERED.


DATED:   December 8, 2006.

                                    /s/ Oliver W .Wanger
                         _____
                              Oliver W. Wanger
                         UNITED STATES DISTRICT JUDGE

88